IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **RICHARD BRASKO**, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Case No.: 1:20-cv-03489-SAG |
| **HOWARD BANK**, *successor by merger to First Mariner Bank*, | * | |
| Defendant. | * | |

## MEMORANDUM OPINION

Plaintiffs, Richard Brasko, Lori Brasko, and Eric Rubenstein ("Plaintiffs")—each of whom claims to have obtained a residential mortgage loan from First Mariner Bank ("First Mariner") in 2013—initiated this class action lawsuit against First Mariner asserting two causes of action: (1) violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(a) (Count I); and (2) violations of the Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Count II). ECF 1, ¶¶ 194-235. First Mariner's successor, Howard Bank ("Defendant"), moved to dismiss Count II. ECF 7. Plaintiffs opposed the motion, ECF 10, and Defendant replied, ECF 14. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons set forth below, Defendant's Motion to Dismiss Count II will be denied.

### I.   FACTUAL BACKGROUND

The relevant factual allegations in Plaintiffs' Complaint are as follows: Plaintiffs are borrowers who currently have, or previously had, a residential mortgage loan originated and/or brokered by First Mariner. ECF 1, ¶ 1. Plaintiffs allege that they are victims of an "illegal kickback agreement" between First Mariner and All Star Title, Inc. ("All Star"), a now-defunct Maryland

1

title and settlement services company. *Id.* The scheme centered on First Mariner allegedly accepting kickbacks from All Star in exchange for referring its borrowers to All Star for title and settlement services. *Id.* ¶¶ 2-3. Plaintiffs allege that, under this arrangement, All Star made kickback payments to third-party marketing companies, who then funneled the money to First Mariner, using sham invoices and payment records to make the kickbacks appear to be legitimate payments for services. *Id.* ¶¶ 4, 26, 30, 109. To fund the kickbacks, Plaintiffs allege that All Star charged borrowers "unnecessarily increased and higher fees for title and settlement services." *Id.* ¶ 5. The charges included amounts that were, allegedly, not associated with any legitimate title and settlement service and were charged for the sole purpose of funding and ensuring the continuation of the illegal kickbacks. *Id.* ¶¶ 59, 62, 201.

## II.     LEGAL STANDARD

Defendant has filed a motion to dismiss Count II under Federal Rule of Civil Procedure 12(b)(6). A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'"); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d 435 at 440 (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, a court is not required to accept legal conclusions drawn from the facts. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual

3

allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

In addition, where a claim, such as Count II, sounds in fraud, the claim must meet Rule 9(b)'s heightened pleading standard. *See Donaldson v. Primary Residential Mortg., Inc.*, No. ELH-19-1175, 2020 WL 3184089, at *12 (D. Md. June 12, 2020). Rule 9(b) provides that when fraud is alleged, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Under this rule, a claim that sounds in fraud "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citation omitted). As the Fourth Circuit has held, Rule 9(b) requires the plaintiff to plead "the who, what, when, where, and how of the alleged fraud" to survive a motion to dismiss. *United States ex rel. Wilson v. Kellogg Brown & Root*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted). Among other things, Rule 9(b) ensures that the defendant has sufficient information to formulate a defense, protects defendants from frivolous suits, and serves to eliminate fraud actions in which all the facts are learned after discovery. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).

4

Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see also Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), cert. denied, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Plaintiffs included 22 exhibits with the Complaint. ECF 1-2 to ECF 1-23. All of the documents are specifically referenced in the Complaint. Accordingly, in ruling on the Motion to Dismiss, I may consider the exhibits without converting the Motion to one for summary judgment.

## III.    ANALYSIS

18 U.S.C. § 1962(a), under which Plaintiffs allege their Count II RICO claim, prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in . . . the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." A civil RICO claim requires allegations of: "1) conduct [causing injury to business or property]; 2) of an enterprise; 3) through a pattern of racketeering activity." *Ekstrom v. Cong. Bank*, No. ELH-20-1501, 2020 WL 6565251 at *17 (D. Md. Nov. 6, 2020) (quoting *Morley v. Cohen*, 888 F.2d 1006, 1010 (1989)).

### a. Pattern of Racketeering Activity

A pattern of racketeering activity is established by allegations where: "(1) at least two predicate acts occurred within ten years of each other; (2) the predicate acts were related; and (3) the acts 'amount to or pose a threat of continued criminal activity.'" *Swarey v. Desert Capital Reit, Inc.*, DKC-11-3615, 2012 WL 4208057, at *12 (D. Md. Sept. 20, 2012) (quoting *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Here, the predicate acts alleged are mail and wire fraud. As such, Plaintiff "must show (1) a scheme to defraud and, (2) use of the mails or wires in furtherance of the scheme." *Ekstrom*, 2020 WL 6565251 at *21 (citing 18 U.S.C. §§ 1341; 1342).

When mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must be pled with particularity under Rule 9(b). *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989). To satisfy this particularity requirement, the Complaint must allege the "time, place,

6

and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby." *Harrison*, 176 F.3d at 784 (internal citation omitted). That said, "a court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which he will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *Scott v. WFS Fin., Inc.*, No. 2:06-cv-349, 2007 WL 190237, at *5 (E.D. Va. Jan. 18, 2007) (quoting *Harrison*, 176 F.3d at 784).

First, Plaintiffs sufficiently plead the predicate act of mail fraud by virtue of the Complaint's extensive detailing of when the mailed solicitations were sent, how many of them were sent, who sent them, and how their sending furthered the scheme to defraud. ECF 1 ¶¶ 26, 30, 45, 51. The crux of Defendant's argument to the contrary is that Plaintiffs do not allege the contents of the mailings in question and thus fail to satisfy Rule 9(b)'s particularity requirement. ECF 7-1 at 8-10. This argument, however, confuses the uncontroversial need to allege the "contents of the false representations" with a supposed need to allege the contents of the mailings themselves. Defendant's proffered case law highlights this issue—each holds that a complaint alleging mail fraud as a predicate act must specify the contents of alleged misrepresentations, but none require allegations specifying the contents of the mailings, if the misrepresentations are not contained therein. *See VNA Plus, Inc. v. Apria Healthcare Grp., Inc.*, 29 F. Supp. 2d 1253, 1258 (D. Kan. 1998), *Ekstrom*, 2020 WL 6565251, at *21, *Somerville v. W. Town Bank & Tr.*, No. CV PJM 19-0490, 2019 WL 6131288, at *1 (D. Md. Nov. 19, 2019). To be sure, these courts considered the mailings' alleged contents as part of their respective analyses, but at no point did any of them hold that such allegations regarding mailings' contents were *required*. In fact, extensive Fourth Circuit case law holds that a mailing's contents need not contain false

7

representations in order to constitute mail fraud, *Proctor*, 64 F. Supp. 2d at 473, highlighting the critical distinction here—Rule 9(b) requires the contents of the misrepresentations at issue to be detailed to sufficiently plead mail fraud, but the mailings themselves need not contain the misrepresentations. Here, the core misrepresentations are the fraudulent title and settlement service charges and related statements and concealments made by First Mariner in the loan documentation provided to the borrowers. *See, e.g.*, ECF 1 at ¶¶ 126-147 (outlining the false representations and omissions made by First Mariner on loan documents, including inaccurate "Good Faith" estimates and settlement statements). The mailings merely facilitated the scheme by soliciting those borrowers in the first place. It is the contents of the misrepresentations related to the fraudulent service charges that the Complaint must detail, not the contents of items sent by mail.[1]

Sure enough, Plaintiffs provide "the time, place, and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby." *Harrison*, 176 F.3d at 784 (internal citation omitted). Plaintiffs have alleged the time and place

---

[1] The Court notes that the Complaint includes a single reference describing the mailings as "fraudulent". ECF 1 ¶ 6. This, Defendant argues, counters Plaintiffs' present suggestion that these were "innocent mailings" simply used in furtherance of a fraudulent scheme. ECF 14 at 4. Such a restrictive reading of the pleadings runs contrary to the Court's responsibility at this early stage of the litigation—to ensure that the Complaint contains enough detail "to give adequate notice to an adverse party and enable him to prepare an adverse pleading." *Windsor Assocs., Inc. v. Greenfeld*, 564 F. Supp. 273, 280 (D. Md. 1983). That pragmatic standard is satisfied here by the allegations regarding the fraudulent title and settlement service charges and the particulars of how the mailings were used to further that scheme. The Complaint provides significant detail regarding who sent the mailing solicitations, the dates of the mailings, the number of mailings, and how the mailings fit into the overarching scheme. *E.g.*, ECF 1 ¶¶ 26, 30, 45, 51. Requiring Plaintiffs to file an amended complaint removing a single line referencing the mailings as "fraudulent," when the rest of the highly detailed factual allegations regarding mail fraud more than suffice to meet Rule 9(b)'s requirements, would be to prioritize form over substance and would waste the parties' and the Court's time. To the extent that discovery reveals the mailings themselves were not, in fact, fraudulent, Defendant is free to re-raise the issue at summary judgment.

the fraudulent title and settlement service charges were made. ECF 1 ¶¶ 64-65, 74-75, 119, 127-129, 140, 146, 152-153, 160-163, 172-173, 181.  Plaintiffs have alleged that the fraudulent title and settlement service charges were made by First Mariner and its employees in specific government mandated forms, including estimates and disclosures. *Id.* ¶¶ 127-133, 155-156, 176-177; 134-139, 162-163, 183; 141-145, 164, 184.  Plaintiffs have alleged how much and what First Mariner obtained from the fraudulent title and settlement service charges. *Id.* ¶¶ 7, 58-59, 61-63, 66, 69-73, 75-76, 78-84, 92-93, 96, 100-101.  They furthermore provide significant detail regarding the mailings and allege in detail how those mailings were used to further the fraudulent service charges.  ECF 1 ¶¶ 26, 30, 45, 51 (detailing how, when, and why those mailings were sent, namely, to bring in more borrowers on which fraudulent charges could be levied).  As such, the Complaint provides the requisite specificity with regard to both the use of the mails and the alleged fraudulent misrepresentations.

Defendant's arguments against the Complaint's wire fraud allegations are similarly unavailing.  Plaintiffs identify with specificity (by date, amount, and third-party marketing company laundering the kickback) Defendant's use of interstate wires to receive and accept illegal kickbacks.  ECF 1 ¶ 26, 30.  Plaintiffs also attach numerous emails further demonstrating First Mariner's use of interstate wires to establish and administer the kickback scheme and the related scheme to defraud. *Id.* ¶¶ 51, 52, 53, 54, 63 and Exs. 3, 4, 5, 6, 8.  In response, Defendant points out that the Complaint lacks any direct reference to interstate communications and does not sufficiently allege that any wire communications crossed state lines.[2]  ECF 14 at 6.  However, use

---

[2] Defendant also appears to suggest that, because Plaintiffs never explicitly state that the email-related factual allegations constitute wire fraud, the Court must dismiss the wire fraud claim. *See* ECF 14 at 9.  Again, such a narrow reading of the Complaint runs counter to the Court's role at this early stage of the litigation, which is to draw all inferences in the light most favorable to Plaintiffs and to ensure that the Complaint contains enough detail "to give adequate notice to an

of the Internet, and thus emails in and of themselves, constitute wire transmissions in interstate commerce and satisfy the requirement regardless of whether the recipients were across state lines. *See, e.g.*, *Jeffries v. United States*, No. 4:15CR83, 2018 WL 4903267, at *4 (E.D. Va. Oct. 9, 2018) (compiling case law and concluding that, in the context of a statute requiring communications to be in interstate commerce, the interstate jurisdictional element was satisfied by use of the Internet without proof that individual messages crossed state lines); *USA v. Okomba*, No. 318CR00292RJCDSC, 2019 WL 4235224, at *2 n.4 (W.D.N.C. Sept. 6, 2019) (collecting pattern jury instructions from various jurisdictions stating that use of the Internet to send a message, such as an e-mail, may constitute a wire transmission in interstate commerce); *Sophia v. Myicis*, No. C 07-02364 SI, 2008 WL 5411479, at *2 (N.D. Cal. Dec. 29, 2008) (finding that "use of the internet qualifies as use of United States wires" in the context of a wire fraud predicate act).

Moreover, even if Plaintiffs' wire fraud claims were inadequate, the Complaint's mail fraud allegations alone would suffice as the requisite predicate acts to maintain the RICO claim. The Supreme Court has recognized that, in cases involving multiple mailings sent in furtherance of a scheme to defraud, "each of these mailings [is] an 'act which is indictable' as mail fraud, and together constitute[s] a 'pattern of racketeering activity.'" *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648 (2008). While this baseline rule confirms that mailings alone can constitute

---

adverse party and enable him to prepare an adverse pleading." *Windsor*, 564 F. Supp. at 280. The Complaint clearly alleges particularized facts regarding Defendant's use of emails in furtherance of the service charge scheme, ECF 1 ¶¶ 51, 52, 53, 54, 63 and Exs. 3, 4, 5, 6, 8, and at the same time clearly alleges that wire fraud is one of the predicate acts underpinning the RICO claim, *e.g.*, ECF 1 ¶ 220. This is enough information for Defendant to be sufficiently on notice of the wire fraud allegations. Furthermore, were the Court to find the Complaint inadequate on this ground, Plaintiffs' subsequent amendment to remedy this "error" would be entirely devoid of substance— simply adding a sentence stating that each email is a predicate act of wire fraud. The Court declines to require such a substance-less formality at this early stage of the litigation, particularly where, as explained below, the RICO claim survives regardless of whether the predicate act of wire fraud is adequately pled.

the required pattern of racketeering activity, the Court must also assess whether the pattern of mailings in question are sufficiently serious and distinct from "garden-variety fraud" to warrant treatment as a RICO claim. The determination of whether the predicate acts alleged form a RICO pattern requires a "commonsensical, fact-specific approach." *Menasco Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989).

Here, the huge volume of mailings soliciting new borrowers across the country, as well as the lengthy time period over which these mailings were sent, leads the Court to conclude that such mailings are more than mere "garden-variety fraud claims" and are mailings that constitute "a more serious scope of activity." *See Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). The allegations here involve 190,000 mailings sent over the course of two years to recipients across the nation. ECF 1 ¶¶ 18, 35, 65, 74. The scheme allegedly implicated multiple First Mariner bank branches and at least 22 First Mariner employees. *Id.* ¶¶ 20, 25, 70. Plaintiffs identify at least 264 affected loans assigned and referred from First Mariner to All Star, as well as tens of thousands of dollars in kickbacks paid from All Star to First Mariner in return, with the borrowers on these loans comprising hundreds of alleged victims. *Id.* ¶¶ 26, 29, 30, 33-34. This is far removed from the "garden-variety" scenarios contemplated in *Al-Abood*, where the "narrow focus of the scheme" was "essentially a dispute between formerly close family friends" and involved "commonplace predicate acts." *See* 217 F.3d at 238. Instead, this case is closer to *Somerville* and *Ekstrom*, in which the schemes involved a large number of borrowers and occurred over an extended period of time. *See* 2019 WL 6131288, at *5 (finding a scheme involving at least six bank branches over the course of five years affecting over 2,000 borrowers in multiple states to be far-reaching enough to exceed garden-variety fraud); 2020 WL 6565251, at *23 (deeming a scheme involving two companies and five bank branches, carried out over eighteen months and

affecting over 800 borrowers' loans in 30 states, to be sufficiently expansive to exceed "garden-variety fraud"). There is nothing commonplace or narrow about sending hundreds of thousands of mailings over the course of two years to advance a fraudulent service charge scheme—that sort of broad and far-reaching conduct is precisely the sort of activity that, on its face, constitutes a "pattern of racketeering activity" as outlined in *Bridge*.[3] Plaintiffs have thus adequately alleged, with particularity, the predicate acts of both wire and mail fraud, although the mail fraud allegations alone suffice to create a pattern of racketeering activity.

### b. The RICO "Enterprise"

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "An 'enterprise' requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit (even if some leave as long as the organization remains the same); and (3) the enterprise is an entity separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp.2d 464, 477-78 (D. Md. 2009). Defendant suggests that the Complaint fails the third prong and alleges "nothing more than an ordinary commercial relationship, through which each entity pursued their

---

[3] Defendant repeats this "garden-variety fraud" argument regarding the "pattern of racketeering" portion of the RICO analysis. *See* ECF 7-1 at 17-18. This Court's conclusion is the same in that context as well. "Garden-variety fraud" has, generally, been found when the fraud alleged is particularly and overtly narrow, such as the dispute among family friends in *Al-Abood* or a dispute involving a small group of investors in *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987). *See also Friedler v. Cole*, No. CIV.A. CCB-04-1983, 2005 WL 465089, at *12 (D. Md. Feb. 28, 2005) (deeming RICO claim insufficient because the scheme was driven by a single defendant and was "narrowly targeted to misappropriate the plaintiffs' investments"); *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (finding that allegations failed to satisfy RICO requirements because defendants' actions were "narrowly directed towards a single fraudulent goal;" involved one perpetrator and one set of victims; and, the transaction took place in a period of one year). The common thread through all of these cases is their narrow scope—a sharp contrast to Plaintiffs' allegations here.

own, independent goals." ECF 7-1 at 15-17. The Complaint, however, expressly alleges that First Mariner and All Star associate "for the common purpose of defrauding borrowers into paying higher, fraudulent, and fixed prices for title and settlement services," ECF 1 ¶¶ 5, 59, 62, 66, 75, 86, 218-219, and explains that the purpose of the association-in-fact enterprise was separate and apart from First Mariner's and All Star's legitimate businesses, *id.* ¶¶ 28, 32, 56, 93, 101, 218. The Complaint buttresses those claims with factual allegations detailing the payment, receipt, and acceptance of illegal kickbacks, *id.* ¶¶ 5, 7, 58-59, 93, 101, and outlining at length how First Mariner and All Star coordinated their conduct in furtherance of the scheme with regard to mailing solicitations, setting the fraudulent fee structures, and more, *id.* ¶¶ 58-86 and Exs. 4-14. All of this evidence places the alleged conduct far outside the realm of an ordinary commercial relationship with each business pursuing their own independent goals. *See Tracey v. First American Title Insurance Co.*, 935 F. Supp. 2d 826, 844 (D. Md. 2013) (explaining that allegations of deliberate overcharging and misappropriation in the context of a title insurance scheme are "unlawful acts . . . not conducted in the ordinary course of business"); *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 461 (E.D. Pa. 2010) ("The fact that the organization between Defendant and its title agents engages in legitimate functions of performing title searches, selling and providing title insurance, and investigating and paying claims does not overcome the claim of illicit overcharging which is not part of the normal affairs of the business relationship.").

Defendant's citation to *Peters v. Aetna, Inc.*, No. 1:15-CV-00109-MR, 2016 WL 4547151 (W.D.N.C. Aug. 31, 2016), is inapposite. There, the district court found that the plaintiff had "fail[ed] to allege any facts demonstrating . . . 'coordination' between Aetna and Optum to establish a RICO enterprise." *Id.* at *9. The *Peters* court was thus left to rely only on the contractual relationship between Optum and Aetna, concluding that "[w]ithout an indication that

the cooperation in this case exceeded that inherent in every commercial transaction, the Complaint provides no basis for inferring that the Defendants were conducting the enterprise's affairs and not their own, independent interests." *Id.* (internal quotations omitted). Here, by contrast, Plaintiffs allege facts that go far beyond an ordinary commercial relationship in which First Mariner and All Star operated exclusively for their own interests, outlining at length the sort of coordination that was absent in *Peters* including coordination of mailing campaigns and changes to the fraudulent fee structures. ECF 1 ¶¶ 58-86; 106-147 and Exs. 4-14; *see also Ekstrom*, 2020 WL 6565251 at *20 (finding allegations of "common purpose" sufficient where the common purpose was to defraud borrowers into paying higher, fixed prices for title and settlement services and where Complaint detailed with specificity the specific roles and relationships the alleged conspirators had). As such, at this early stage of the litigation and drawing all inferences in favor of Plaintiffs, the Complaint sufficiently pleads the existence of a RICO enterprise.

### c. Reinvestment of Income into the RICO Enterprise

To adequately plead a RICO claim pursuant to Section 1962(a), a plaintiff must allege that the person: (1) received income derived from a pattern of racketeering activity, and (2) used or invested that income in the enterprise. *See* 18 U.S.C. § 1962(a). Defendant's final contention is that Plaintiffs have failed to adequately allege that First Mariner reinvested into the RICO enterprise. Specifically, Defendant asserts that the Complaint does not allege "how much First Mariner reinvested into the enterprise, the 'contours of the reinvestment' and any 'specific details' about how the income was used to operate the alleged enterprise." ECF 7-1 at 20 (quoting *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 606 (D. Md. 2014)). The Complaint, however, alleges that First Mariner received more than $45,000 in kickbacks from All Star, providing granular specifics as to individual kickback amounts (down to the cent), the specific

days the kickbacks were transmitted, and the companies through which the kickbacks were laundered. ECF 1 ¶¶ 26, 30. Later, Plaintiffs allege that "First Mariner chooses to reinvest and use the illegal kickbacks to produce and mail thousands of borrower solicitations; thereby generating the loans necessary to fulfill its obligations under the Kickback Agreement and the borrowers necessary to charge the fraudulent fees in furtherance of the Scheme to Defraud." *Id.* ¶ 64. Plaintiffs supplement this allegation regarding how the mailers generate more business for the enterprise with an email between All Star employees discussing the most recent "campaign," which generated 11 loans and a $270.38 "cut" for both entities. *Id.* ¶ 51. The Complaint goes on to provide specific details about multiple instances of these mailings, including the amount of direct mail solicitations sent, the dates on which they were sent, and the companies from which they were sent. *Id.* ¶¶ 65, 74. These factual allegations satisfy *Chambers*, outlining how much was invested (the kickbacks totaling more than $45,000) and "the contours of the reinvestment" (the detailed specifics regarding the mailings and how they fueled the enterprise). Plaintiffs therefore have, at this early stage of the litigation in which all facts alleged are taken as true and all inferences are drawn in their favor, sufficiently pled reinvestment of income into the RICO enterprise.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss Count II, ECF 7, is DENIED. A separate Order follows.

Dated: April 27, 2021               /s/
                          Stephanie A. Gallagher
                          United States District Judge