IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| RICHARD BRASKO, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Case No. 1:20-cv-3489-SAG |
| | * | |
| HOWARD BANK, *successor by merger to* | * | |
| FIRST MARINER BANK | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## <u>MEMORANDUM OPINION</u>

Plaintiffs Richard and Lori Brasko and Eric Rubinstein, on behalf of themselves and a putative class of similarly situated individuals, sued Howard Bank[1] alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(a) and the Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. Plaintiffs' claims arise out of an alleged kickback scheme between Howard Bank's predecessor, First Mariner, and All Star Title, Inc. ("All Star"), a defunct title and settlement services company, whereby First Mariner referred residential mortgage loans to All Star for title and settlement services in exchange for payments from All Star that were allegedly laundered through third-party marketing companies. Plaintiffs have now filed a motion for class certification, seeking the certification of a class and two subclasses. ECF 31. First Mariner opposed the motion, ECF 41, and Plaintiffs filed a reply, ECF 42. This Court has reviewed all of these filings and their attached exhibits. No hearing is

---

[1] As described in the case caption, Howard Bank is the successor by merger to First Mariner Bank, the actor in the scheme alleged in the Complaint. Recently, Howard Bank merged with First National Bank. The parties should determine whether the Complaint needs to be re-titled accordingly.

necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons set forth below, Plaintiffs' motion will be granted.

## I.     FACTUAL BACKGROUND

The relevant factual allegations in Plaintiffs' Complaint are as follows: Plaintiffs are borrowers who currently have, or previously had, a residential mortgage loan originated and/or brokered by First Mariner.  ECF 1 ¶ 1.  Plaintiffs allege an "illegal kickback agreement" between First Mariner and All Star in which First Mariner allegedly accepted kickbacks from All Star in exchange for referring its borrowers to All Star for title and settlement services.  *Id.* ¶¶ 2-3. Plaintiffs allege that, under this arrangement, All Star made kickback payments to third-party marketing companies, who then funneled the money to First Mariner, using sham invoices and payment records to make the kickbacks appear to be legitimate payments for services.  *Id.* ¶¶ 4, 26, 30, 109.   To fund the kickbacks, Plaintiffs allege that All Star charged borrowers "unnecessarily increased and higher fees for title and settlement services."  *Id.* ¶ 5.  The charges included amounts that were, allegedly, not associated with any legitimate title and settlement service and were charged for the sole purpose of funding and ensuring the continuation of the illegal kickbacks.  *Id.*  ¶¶ 59, 62, 201.

## II.    LEGAL STANDARD

The "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  Class actions are subject to Federal Rule of Civil Procedure 23(a), which requires that: (1) the alleged class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the representatives' claims are typical of the claims of the class; and (4) the

representatives will fairly and adequately protect the interests of the class.  The party seeking certification carries the burden of demonstrating that it has complied with Rule 23.  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).  The four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequate representation—limit the class claims to those fairly encompassed by the named plaintiff's claims.  *Dukes*, 564 U.S. at 349.

After satisfying the Rule 23(a) prerequisites, the plaintiffs must show that the proposed class action satisfies one of the enumerated conditions in Rule 23(b).  *See, e.g.*, *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003).  Here, Plaintiffs seek class certification pursuant to Rule 23(b)(3).  Under that rule, a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Courts evaluating class certification "must rigorously apply the requirements of Rule 23." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998).  Although the court's analysis must be "rigorous" and "may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Ct. Ret. Plans and Trust Funds*, 568 U.S. 455, 465-66 (2013) (citation omitted) (quoting *Dukes*, 564 U.S. at 351).  The merits may be considered only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.  *Id.* at 466.

### III.    ANALYSIS

#### A.  Standing

As a preliminary matter, First Mariner asserts that Plaintiffs have not suffered a concrete injury and therefore lack Article III standing.  ECF 41 at 18-23.  Standing is a doctrine rooted in the traditional understanding of an Article III "case or controversy."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Standing consists of three elements: "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The burden is on the plaintiffs to establish these elements.  *Id.*

Injury in fact is the "first and foremost" of standing's three elements.  *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998).  To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  Importantly, "[i]n a class action matter, we analyze standing based on the allegations of personal injury made by the named plaintiffs."  *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017); *see also Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) ("The strictures of Article III standing are no less important in the context of class actions.").

Since *Spokeo*, it is clear that plaintiffs may not satisfy the strictures of Article III by alleging "a bare procedural violation."  578 U.S. at 341.  Rather, plaintiffs must have suffered a concrete harm as a result of the "defendant's statutory violation that is the type of harm Congress sought to prevent when it enacted the statute."  *Baehr*, 953 F.3d at 253 (quoting *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240-41 (4th Cir. 2019)).  The Fourth Circuit has explained that under

4

RESPA, "the deprivation of impartial and fair competition between settlement services providers" is not the kind of harm Congress sought to prevent and, thus, will not confer Article III standing. *Id.* at 254. Rather, "the harm it sought to prevent is the increased costs . . . for settlement services." *Id.* (holding that deprivation of fair competition "untethered from any evidence that the deprivation increased settlement costs—is not a concrete injury under RESPA"); *see also Edmondson v. Eagle Nat'l Bank*, 336 F.R.D. 108, 112-13 (D. Md. 2020).

First Mariner argues that "even if Plaintiffs could show an unlawful 'kickback' occurred in connection with their loan transactions . . . they still have not shown (and cannot show) that they paid 'increased settlement costs'—*i.e.* that All Star overcharged them for settlement services—as a result of a kickback." ECF 41 at 19. In support of this argument, First Mariner points to portions of the named Plaintiffs' deposition testimonies which, understandably, reflect their less-than-perfect explanation of the legal intricacies of a RESPA claim. ECF 41 at 20. First Mariner seizes on Mr. Brasko's statement that he was overcharged for title insurance and then proceeds to "disprove" his claim by explaining that "title insurance is fixed by regulation," *id.*, and that, in any event, Plaintiffs' alleged title-related charges were reasonable. *Id.* at 21.

As Plaintiffs argue, however, First Mariner's argument is predicated on a misapplication of RESPA's requirements. Plaintiffs' theory of injury is not dependent on their ability to show a particular "overcharge" for a particular settlement service—the hallmark of illegal fee splitting cases under 12 U.S.C. § 2607(b). Instead, Plaintiffs must show unlawful "business referrals" (*i.e.* kickbacks) under 12 U.S.C § 2607(a). Contrary to First Mariner's argument, then, Plaintiffs need not point to a particular overcharge but instead must demonstrate that they were injured by "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." *Baehr*, 953 F.3d at 254 (quoting 12 U.S.C. § 2601(b)(2)).

At this stage, Plaintiffs have proffered evidence sufficient to support their argument that "All Star and First Mariner agreed to charge borrowers an amount not associated with any legitimate settlement service and for the sole purpose of funding illegal kickbacks." ECF 42 at 3. Plaintiffs have presented evidence that, at the time of Plaintiffs' loans, First Mariner had "agreed to" All Star's differential pricing scheme where it would charge borrowers different prices for settlement services depending on whether the borrowers were referred from lenders that received kickbacks from All Star or from lenders that did not receive kickbacks. *Id.* at 5-6. Plaintiffs' evidence supports its assertion that First Mariner and All Star had even agreed to specific amounts that All Star would charge First Mariner borrowers "to pay for the kickbacks." *Id.* at 6. Indeed, emails between First Mariner and All Star appear to show both parties admitting that these specified amounts were to "cover," "compensate," and "recapture" the cost of kickbacks. *Id.* (citing ECF 31-5; ECF 31-25; ECF 31-26). Finally, Plaintiffs' evidence supports its claims that this scheme was employed at First Mariner's Bel Air Branch "at the time of the Plaintiffs' loans[,]" *id.* at 5-6, that "Plaintiffs' refinances were originated at the First Mariner Bel Air Branch[,]" *id.* at 6-7, and that the unlawful kickbacks are, in fact, reflected on the named Plaintiffs' loan documents. ECF 31-1 at 23-25. At this point, this evidence is sufficient to demonstrate that if Plaintiffs' allegations prove true, the named Plaintiffs have suffered a cognizable injury in fact that supports their Article III standing.

First Mariner relies on the Supreme Court's recent decision in *TransUnion LLC v. Ramirez* to argue that Plaintiffs must ultimately demonstrate standing on a class-wide basis in order for class members to prevail. 141 S. Ct. 2190, 2208 (2021). As the *TransUnion* decision explained, however, "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan*, 504 U.S. at 561). Under

*TransUnion*, Plaintiffs will ultimately need to demonstrate that each class member has Article III standing. However, at this point, their allegations, combined with the evidence they have marshalled in support, suffice to demonstrate that it is at least plausible that the entire class has suffered an injury in fact and that Plaintiffs will ultimately be able to prove each class member's Article III standing.

### B. Class Certification

#### i. Readily Identifiable

In the Fourth Circuit, any proposed class must be "readily identifiable," which other courts refer to as "ascertainability." *EQT Prod.*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). In other words, a proposed class's definition must allow a court to "readily identify the class members in reference to objective criteria." *Id.* Notably, the plaintiff "need not be able to identify every class member at the time of certification." *Id.* The class definition must simply "ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT Prod.*, 764 F.3d at 358). Only if a class definition renders it "impossible" to identify class members "without extensive and individualized fact-finding or 'mini-trials'" is a class action inappropriate. *EQT Prod.*, 764 F.3d at 358 (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-94 (3d Cir. 2012)).

First Mariner does not specifically challenge the identifiability of the putative class. However, Plaintiffs have provided a spreadsheet "drawn from All Star's business records and Title Express loan processing data," ECF 31-1 at 30, that identifies each class member and provides important information about each member's loan. ECF 31-3. The putative class is, therefore, readily identifiable. *See James v. Acre Mortgage & Financial, Inc.*, No. SAG17-1734, 2020 WL

2848122, at *5 (D. Md. June 2, 2020) ("In essence, then, each class member has already been ascertained.  Thus, this Court readily concludes that Plaintiff has shown that her class is readily identifiable.").

### ii.  Rule 23(b)(3)

Plaintiffs have moved to certify a class under Rule 23(b)(3), which requires a finding that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  As a result, Rule 23(b)(3) class actions "must meet predominance and superiority requirements not imposed on other kinds of class actions." *Gunnells*, 348 F.3d at 424.  Importantly, "[i]n a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions.'" *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997)).  Thus, the Court analyzes predominance and commonality together, and will begin with that inquiry before returning to the remaining requirements of Rule 23(a).  *See, e.g.*, *Romeo v. Antero Res. Corp.*, No. 1:17CV88, 2020 WL 1430468, at *8 (N.D. W. Va. Mar. 23, 2020) ("[T]he Court will consider commonality in its discussion of predominance.").

### 1.  Predominance of Common Questions

To satisfy predominance, common questions must have significant "bearing on the central issue in the litigation."  *EQT*, 764 F.3d at 366.  In other words, the requirement is met where all class members' claims "depend upon a common contention," and establishing "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  Here, the essence of each proposed class member's claim against First Mariner

is that First Mariner referred them to All Star for settlement services because All Star promised to, and actually did, provide kickbacks to First Mariner that were laundered through third party marketing companies.  Whether this widespread scheme existed and, if so, how it was executed are common questions "at the heart of the litigation" that will produce common answers.  *See EQT*, 764 F.3d at 366.

Still, First Mariner raises several issues that it believes will destroy predominance, including: (1) that Plaintiffs have not demonstrated a plan for determining standing; (2) that Plaintiffs have not shown any common liability issue; (3) that individualized analyses are necessary to determine damages; and (4) that First Mariner's limitations defenses cannot be adjudicated on a class-wide basis.  This Court will address these arguments in turn, although it ultimately finds that none of them "overwhelm[s] questions common to the class."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

### a.   Plan for Determining Standing

In the context of predominance, First Mariner's standing argument is essentially that the individualized analysis that would be required for each class member to demonstrate standing defeats predominance.  According to First Mariner, "the evidence that would prove an alleged overcharge as to one class member will not prove an alleged overcharge as to any other class member, and the only way for the Court to determine whether any class member was in fact overcharged by All Star is to conduct a transaction-by-transaction analysis."  ECF 41 at 25.

First Mariner's position significantly overreads the Supreme Court's *TransUnion* decision. While First Mariner correctly relies on *TransUnion* to argue that Plaintiffs will need to prove each class member's injury, it does not follow that because Plaintiffs may have suffered different amounts of monetary harm they are therefore unable to demonstrate each class member's Article

III injury—either individually or on a class-wide basis.  Surely the Supreme Court did not hold in *TransUnion* that a class may not be certified if its members have suffered different amounts of monetary harm.  *See Gunnells*, 348 F.3d at 427-28 ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification.  In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations.").  While Plaintiffs will ultimately need to prove that each class member was injured, the fact that Plaintiffs may have been overcharged by different amounts as a result of the kickbacks at issue neither destroys their standing nor the predominance of the common legal and factual issues related to their claims.

### b.  Common Liability Issues

First Mariner argues that Plaintiffs have not identified any common theory of liability.  First, it argues that Plaintiffs have not pleaded around RESPA's safe harbor which provides that "'Nothing' in Section [2607] 'shall be construed as prohibiting' the 'payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.'"  *PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 41 (D.C. Cir. 2016) (quoting 12 U.S.C. § 2607(c)(2)), *rev'd on other grounds*, 881 F.3d 75 (D.C. Cir. 2018) (en banc).  According to First Mariner, "Plaintiffs offer no evidence or argument that any of All Star's payments, let alone all of All Star's payments, to Lendanear or Influence Direct for marketing services were not reasonably related to the market value of those services or were otherwise outside the scope of RESPA's safe harbor[.]"  ECF 41 at 26-27 (emphasis in original).  But Plaintiffs' entire theory in this case is that these payments were not related to any marketing related services All Star was receiving and that, instead, the payments were in exchange for referrals from First Mariner.  And Plaintiffs have provided evidence to support that theory.  ECF

42 at 12-13.  While RESPA may allow joint marketing, it does not allow a kickback scheme that involves a title company paying for a lender's marketing efforts in exchange for referrals, and then passing those costs on to borrowers by disguising them as settlement charges.  This Court, of course, expresses no opinion about whether Plaintiffs will ultimately succeed in proving these claims, but their allegations—and the evidence they have provided to date—suggest that the relationship between All Star and First Mariner may have gone far beyond a mere "joint marketing" scheme.

As it relates to predominance, though, First Mariner argues that "Plaintiffs have proposed no plan to adjudicate on a class-wide basis whether marketing services were 'actually performed' under RESPA's safe harbor provision or whether All Star's payments for those services were 'reasonably related to the value of services actually performed."  ECF 41 at 28.  This Court disagrees.  Plaintiffs have represented—both in argument and with evidence—that All Star's payments to the marketing companies "was conditioned on the referral of business" from First Mariner "because First Mariner and All Star *expressly say so* in their emails."  ECF 42 at 12 (citing and quoting emails) (emphasis in original).  Moreover, Plaintiffs argue that "All Star determines whether to make" these payments based on "the number of loans First Mariner referred to All Star[.]"  *Id.*  First Mariner argues that "Plaintiffs simply ask the Court to assume that all of All Star's payments were *per se* RESPA and RICO violations."  ECF 41 at 28.  Plaintiffs do not ask this Court to *assume* that conclusion, they propose to *prove it*.  Plaintiffs' proposal to prove that *all* of All Star's payments to marketing companies were in furtherance of its alleged kickback scheme is an issue common to all class members, rather than one that requires individualized

analysis.[2]  Indeed, the commonality of the kickback scheme and its alleged influence on borrowers' choice of title company and the settlement costs they ultimately incurred predominates over any potential individualized inquiries.

### c.  Damages

First Mariner argues that determining Plaintiffs' damages will raise individualized issues that preclude a finding that common factual and legal issues predominate.  ECF 41 at 30-35.  First Mariner correctly notes that the Fourth Circuit has held that "where the issue of damages and impact does not lend itself to . . . a mechanical calculation, but requires separate mini-trials of an overwhelming large number of individual claims, courts have found that the staggering problems of logistics thus created make the damage aspect of the case predominate and render the case unmanageable as a class action."  *Windham v. American Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977).  First Mariner ignores, however, that the Fourth Circuit has more recently concluded that "Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification.  In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations."  *Gunnells*, 348 F.3d at 427-28.

Regardless, First Mariner misconstrues *Windham*.  There, the putative class involved more than 20,000 potential members in a highly complex antitrust action against tobacco companies. *Windham*, 565 F.2d at 62-63, 66.  The Fourth Circuit found that "individual actions, regarded as

---

[2] First Mariner also argues that "Because proof of RESPA violations at [First] Mariner's Bel Air branch would not prove, 'in one stroke,' *Dukes*, 564 U.S. at 350, that similar violations occurred at any other [First] Mariner branch, Plaintiffs' claims are not typical of the claims of putative class members whose loans were originated at other [First] Mariner branches."  ECF 41 at 29-30.  But Defendants do not point to any branch- or Plaintiff-specific issues that would preclude a finding of predominance or, as discussed below, typicality.

test cases, would be in this situation a superior procedure to a class action[,]" in part because the "computation of damages would be a complex, highly individualized task, imposing an intolerable burden on the judicial system." *Id.* at 70. The Fourth Circuit did not find, as First Mariner suggests, that the individualized nature of damages determinations destroyed the predominance of common legal or factual issues. Instead, the Fourth Circuit simply affirmed the district court's determination that proceeding as a class action would have been unmanageable and unduly burdensome, especially where litigation could begin with individual test cases. Moreover, this case involves allegations of a relatively straightforward kickback scheme that affected 258 borrowers. ECF 31-3. The complexity and manageability of this case pales in comparison to *Windham*, and even if individualized damages assessments will be required, "Rule 23 contains no suggestion that the necessity for individual damage determinations destroys . . . predominance[.]" *Gunnells*, 348 F.3d at 427-28.

Next, First Mariner argues that Plaintiffs are not legally entitled to treble damages and that, therefore "the Court must determine for each class member 'the settlement service involved in the violation' and the 'amount of any charge paid for such settlement service' in order to calculate damages for each Plaintiff and putative class member." ECF 41 at 31. Again, even assuming (without deciding) that First Mariner's damages argument is correct, that does not destroy predominance. *Gunnells*, 348 F.3d at 427-28. Moreover, Plaintiffs have alleged that borrowers were consistently charged specified amounts for the kickbacks, and that those amounts were consistently listed on their loan documents in particular places. ECF 42 at 6 ("At first, All Star adds $300 to the charges to borrowers assigned and referred from First Mariner . . . . that amount is raised to $450, and then even higher to $950 per loan."); ECF 31-1 at 21-23 (explaining Plaintiffs' allegations that kickbacks were routinely concealed in specific entries on borrowers'

loan documents).   Accordingly, any individualized damages determinations may not require complex analysis or fact-finding and, regardless, the potential need for such determinations does not destroy predominance.

### d.  Limitations

First Mariner also argues that Plaintiffs' claims are barred by limitations and that adjudication of Plaintiffs' fraudulent concealment argument would require an individualized assessment for every class member.   ECF 41 at 36.   As Plaintiffs point out, this Court has repeatedly addressed, and rejected, this argument under nearly identical circumstances.  *Dobbins v. Bank of America, N.A.*, No. SAG-17-0540, 2020 WL 5095855, at *7 (D. Md. Aug. 28, 2020); *James*, 2020 WL 2848122, at *8-9; *Edmondson*, 336 F.R.D. at 116; *Baugh v. Federal Savings Bank*, 337 F.R.D. 100, 110 (D. Md. 2020), *Bezek v. First Mariner Bank*, No. SAG-17-2902, 2020 WL 5877159, at *6 (D. Md. Oct. 2, 2021).

The question whether the statute of limitations should be tolled due to fraudulent concealment presents a common question and can be established without individual issues predominating.  The Fourth Circuit has articulated the proper standard that courts should employ when deciding whether to equitably toll a statute of limitations based on fraudulent concealment. *Edmondson v. Eagle National Bank*, 922 F.3d 535, 548 (4th Cir. 2019).  "A plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence."  *Id.* (quoting *Supermarket of Marlinton, Inc. v. Meadow Gold Diaries, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995)).

First Mariner argues that "[b]ecause an individual class member's actual or inquiry notice hinges on facts uniquely known to that individual class member, the only way to determine which

(if any) class members had actual or inquiry notice of a potential claim during the limitations period is to ask them."  ECF 41 at 37.  To the contrary, though, Plaintiffs' fraudulent concealment argument hinges on First Mariner's and All Star's conduct and their efforts to conceal the kickback scheme.  ECF 31-1 at 37-38.  Moreover, the notice and diligence elements of the test described in *Edmondson* are objective inquiries that can be determined on a class-wide basis.  922 F.3d at 558. At this point, then, where this issue appears far more likely to turn on First Mariner's and All Star's efforts to conceal the alleged kickback scheme than the conduct or circumstances of any individual Plaintiff, any potential limitations issues do not predominate over the legal and factual questions common to the entire class.  In this way, this case is also different from *Thorn v. Jefferson-Pilot Life Ins. Co.*, where the Fourth Circuit found it impossible to determine whether 1.4 million consumers "spread out geographically over four states and temporally over 62 years" acted with due diligence.  445 F.3d 311, 323 (4th Cir. 2006).  Here, the potential scope of borrowers is far more limited in time and geography, and individual hearings will not be necessary to determine whether class members encountered information that would have prompted them to uncover the facts substantiating their RESPA claims.  If, in the course of class-wide discovery, First Mariner uncovers any information that may undermine any Plaintiff's (or group of Plaintiffs') fraudulent concealment argument, it is of course free to continue to assert its limitations defense throughout this case.

*                    *                    *

In sum, none of the issues raised by First Mariner destroys the predominance of common questions pertinent to each class members' claim.  Indeed, some tend to identify more common questions.  First Mariner may ultimately prove that a common agreement and pattern of practice,

15

central to Plaintiffs' theory of liability, did not exist, or were not as pervasive as alleged, but doing so will involve questions of law and fact common to all class members.

### 2.  Superiority

In addition to finding that common questions predominate under Rule 23(b), the Court finds that the class action vehicle is "superior to other methods" of adjudicating this controversy. *See* Fed. R. Civ. P. 23(b)(3).  Based upon the common questions that predominate, as explained above, a class action is more efficient than allowing potentially hundreds of individual claims arising from this purported kickback arrangement.

### iii.  Rule 23(a)

### 1.  Numerosity

Plaintiffs have identified 258 loans that meet the objective class criteria, and First Mariner does not dispute that the numerosity requirement is met.  Thus, the Court finds that the putative class is sufficiently numerous.

### 2.  Typicality

The typicality requirement in Rule 23 requires that "claims or defenses of representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  This prerequisite "goes to the heart of a representative parties' [sic] ability to represent a class."  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).  For that reason, the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim."  *Id.*  The representative plaintiff's claims "need not be 'perfectly identical or perfectly aligned'" with other class members' claims, but "the representative's pursuit of his own interests 'must simultaneously tend to advance the interests of

16

the absent class members.'" *Ealy v. Pinkerton Gov't Servs. Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (unpublished) (quoting *Deiter*, 463 F.3d at 466). This analysis "tend[s] to merge" with adequacy and commonality. *See Broussard*, 155 F.3d at 337 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)).

First Mariner's argument contesting typicality almost entirely overlaps with its standing argument, which has been addressed in the standing and predominance sections above.[3] For the same reasons, this Court finds that Plaintiffs have satisfied their burden, at this stage, to show that the putative class members' claims are typical of one another, and First Mariner's standing arguments do not defeat that showing.

### 3. Adequate Representation

Finally, Plaintiffs must illustrate that they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). First Mariner argues that Mr. and Ms. Brasko and Mr. Rubinstein are inadequate representatives because they lack adequate knowledge about their claims. ECF 41 at 39-41. However, the Fourth Circuit has recognized that a plaintiff "need not have extensive knowledge of the facts of the case in order to be an adequate representative," particularly in a "complex lawsuit . . . in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge[.]" *Gunnells*, 348 F.3d at 430; *see also City of Cape Coral Mun. Firefighters' Ret.*

---

[3] First Mariner also makes a passing reference to typicality in its predominance argument that, "Because proof of RESPA violations at [First] Mariner's Bel Air branch would not prove, 'in one stroke,' *Dukes*, 564 U.S. at 350, that similar violations occurred at any other [First] Mariner branch, Plaintiffs' claims are not typical of the claims of putative class members whose loans were originated at other [First] Mariner branches." ECF 41 at 29-30. As explained above, however, *supra* n.1, Plaintiffs have alleged that First Mariner's kickback scheme extended beyond the Bel Air branch, and First Mariner does not point to any branch-specific facts that undermine Plaintiffs' typicality argument.

*Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 676, 683-84 (D. Md. 2018); *Benway v. Res. Real Estate Servs., LLC*, 239 F.R.D. 419, 425-26 (D. Md. 2006). "Rule 23 does not require the representative plaintiffs to have extensive knowledge of the intricacies of litigation, rather, the named plaintiffs must have a general knowledge of what the action involves and a desire to prosecute the action vigorously." *Fangman v. Genuine Title LLC*, Civil Action No. RDB-24-0081, 2016 WL 6600509, at \*11 (D. Md. Nov. 8, 2016) (quoting *Benway*, 239 F.R.D. at 425-26).

Here, the lead Plaintiffs have misstated certain factual and legal aspects of their claims, and they clearly look to their attorneys to understand the intricacies of the RESPA and RICO statutes and the litigation process more generally. For example, Mr. Brasko testified that he is not familiar with the duties of a class representative and has not "played a role in any decision-making about the direction of the litigation." ECF 41 at 39. He also testified that he believes he and his wife overpaid for title insurance (rather than settlement services generally). ECF 41 at 39-40. Ms. Brasko also inaccurately testified that she believed All Star is a defendant in this case, while Mr. Brasko indicated an awareness that All Star is not a defendant, and Mr. Rubinstein testified that he would like to see that "justice is served" against All Star. *Id.* First Mariner argues that these understandings are both inconsistent with each other and conflict with class counsel's alleged agreement with All Star in which they have agreed not to pursue any claims against All Star. *Id.*

With respect to First Mariner's conflict argument, the Fourth Circuit has held that to disqualify class plaintiffs or counsel based on a conflict between them, the conflict "must go to the heart of the litigation." *Gunnells*, 348 F.3d at 430-31 (quotation omitted). Even if there were a conflict between Plaintiffs and/or their counsel about whether to pursue claims against All Star, that is not a conflict that goes to the heart of Plaintiffs' litigation against First Mariner. Moreover, this Court is not persuaded that Plaintiffs' benign misstatements about the intricacies of their

18

claims precludes them from serving as vigorous class representatives.  Plaintiffs' misstatements reflect their understandable lack of familiarity with class action litigation, the statutes at issue, and how those statutes relate to their legal theories about how the allegedly unlawful relationship between First Mariner and All Star affected their loan settlement process.  Their testimony also reflects a belief that they were harmed by that allegedly unlawful relationship and a desire to seek relief for those wrongs on behalf of themselves and the putative class.  *See* ECF 42 at 18-19.

Additionally, Plaintiffs' counsel, which is largely the same counsel for the classes certified in *Bezek*, 2020 WL 5877159, *Dobbins*, 2020 WL 5095855, *Edmondson*, 336 F.R.D. 108, *James*, 2020 WL 2848122, and *Fangman*, 2016 WL 6600509, will adequately represent the putative class.

### C.  Class Definition

First Mariner argues that the putative class should be limited to borrowers for whom All Star provided settlement services between March 2012 and April 2013 because "Plaintiffs have not alleged, let alone demonstrated, any unlawful joint marketing payments by All Star after April 2013."  ECF 41 at 38.  Plaintiffs have, however, alleged that the First Mariner and All Star participated in the unlawful kickback scheme between 2012-2016.  *See* ECF 1 ¶¶ 29-35.  And they have uncovered evidence that, at least arguably, supports that position.  *See* ECF 42 at 19-20.  To be sure, Plaintiffs have not "demonstrated" as a matter of fact that they are correct, but that is not their burden at this stage.  First Mariner's argument is ultimately a merits-based question that is best left for resolution following merits-based discovery.  Accordingly, at this early stage, this Court declines to narrow the putative class.

### IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Class Certification, ECF 31, will be GRANTED.  A separate order follows.

Dated: March 30, 2022                                    /s/
                                          Stephanie A. Gallagher
                                          United States District Judge