## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **RICHARD BRASKO,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civil No. SAG-20-3489** |
| **FIRST NATIONAL BANK OF PENNSYLVANIA,** | * | |
| **Defendant.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Richard Brasko, Lori Brasko, and Eric Rubinstein (collectively "Plaintiffs") represent a class of borrowers who had residential mortgage loans serviced by First Mariner Bank ("First Mariner"). Plaintiffs assert that First Mariner and its employees violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–17, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, by referring loans to a title services provider in exchange for kickbacks. Five motions are currently pending: (1) a motion to exclude expert Brett Dieck, filed by Defendant First National Bank of Pennsylvania ("Defendant"), successor by merger to First Mariner, ECF 83; (2) a motion to exclude expert William Welch, filed by Defendant, ECF 84; (3) a motion for partial summary judgment, filed by Plaintiffs, ECF 80; (4) a cross-motion for summary judgment, filed by Defendant, ECF 81; and (5) a motion to decertify the class, filed by Defendant, ECF 82. This Court has reviewed all of those motions, along with the related exhibits and briefing. ECF 85, 86, 89, 90, 91, 92, 93, 95, 101, 102, 103. This Court also held a hearing on August 30, 2023. ECF 105. For the reasons below, the motions to exclude experts are granted, Plaintiffs' motion for partial summary judgment is granted, and Defendant's

cross-motion for summary judgment is granted in part, denied in part, and deferred in part. This Court also defers ruling on Defendant's motion to decertify the class and has scheduled another hearing to discuss that motion and the deferred portion of Defendant's cross-motion for summary judgment.

## I.      FACTUAL BACKGROUND

At the time of the relevant events, First Mariner was a Maryland corporation and independently owned bank. ECF 54-1 ¶ 12. All Star Title, Inc. ("All Star") was a title service company operating in Maryland. *Id.* ¶ 2. Plaintiffs Richard and Lori Brasko and Eric Rubinstein are Maryland residents who refinanced their mortgages with First Mariner. ECF 86-1, 86-2. Plaintiffs allege that, from 2012 through 2016, First Mariner brokers referred 257 loans (including Plaintiffs' loans) to All Star for title settlement services as part of an illegal kickback scheme. ECF 54-1 ¶¶ 26–35. For example, in 2012, Tom Bowen, the sales manager at First Mariner's Bel Air branch,[1] entered into a joint marketing arrangement with All Star. ECF 31-3, 31-5, 85-7, 85-8. Under the arrangement, All Star and First Mariner each paid an equal share for the marketing materials to two marketing companies, Lendanear Data & Direct Mail Services ("Lendanear") and Influence Direct, who prepared joint advertisements for All Star and First Mariner. ECF 31-5 at 6–10; ECF 85-6; ECF 85-9. The joint marketing payments ended in April 2013, ECF 85-9 at 3, although Plaintiffs assert that referrals of business as quid pro quo for those payments continued, ECF 89 at 25.

First Mariner loan officer Robert Hoover originated the Braskos' refinance loan in January 2013. ECF 86-1; ECF 85-1 at 30:17–31:4. Before their closing, Hoover gave the Braskos a Good

---

[1] Bowen's title as "sales manager" did not give him managerial or supervisory authority over other employees. ECF 85-11 at 178:14–180:6.

Faith Estimate ("GFE"), including an estimate of $1,550 in total title-related charges. ECF 85-1 at 49:19–50:7. The GFE informed the Braskos that they could compare the GFE with offers from other lenders to find better offers. *Id.* at 54:18–55:7. Also, Hoover informed the Braskos in writing that they had the right to select their own company to perform title services. *Id.* at 60:20–62:7; ECF 93-8. He gave the Braskos a "Service Provider List" that included three recommended title companies but did not include All Star. ECF 85-1 at 58:18–60:16. The Braskos did not contact any of the recommended title companies and did not choose a title company. *Id.* at 59:15–17. Hoover, as the loan officer, referred the loan to All Star for closing. *Id.* at 61:17–62:7. The Braskos' HUD-1 reflects a total of $1,550 in title related charges, consisting of $1,025.75 for title insurance and $524.25 for other title fees. ECF 93-4 at 3.

Plaintiff Rubinstein refinanced his mortgage with First Mariner in March 2013, using Christopher Perrin as his loan officer. ECF 86-2; ECF 85-3 at 35:1–11. Perrin provided Rubinstein with a GFE, including an estimate of $1,550 in title related charges. ECF 85-3 at 39:14–41:7. Perrin informed Rubinstein in writing that he had the right to use a title company of his own choosing. *Id.* at 55:6–56:13. Perrin gave Rubinstein a "Service Provider List" that included three recommended title companies but did not include All Star. *Id.* at 53:5–54:19. Rubinstein did not contact any of the recommended title companies and did not choose a title company. *Id.* at 54:20–21. Perrin, as the loan officer, referred the loan to All Star for closing. *Id.* at 37:7–11. Ultimately, Rubinstein was charged only $1,147.40 in title fees, consisting of $527.80 for insurance and $619.60 for the title examination. ECF 93-9 at 3.

In a Memorandum Opinion and Order issued on March 29, 2022, this Court granted Plaintiffs' motion to certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure.

ECF 46, 47. Specifically, Plaintiffs received certification of the following class of individuals (the "First Mariner Class"), with two subclasses:

> All individuals in the United States who were borrowers on a mortgage loan obtained from First Mariner Bank for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1 or Closing Disclosure, between January 1, 2012 and January 31, 2016. Exempted from this class is any person who, during the period of January 1, 2012 through January 31, 2016, was an employee, officer, member and/or agent of First Mariner Bank, Howard Bank, or All Star Title, Inc.

ECF 47 at 2. The first subclass, the RICO subclass, is comprised of all members of the class. *Id.* The second subclass, the RESPA subclass, "is comprised of all members of the First Mariner Class who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) between January 1, 2012 and January 31, 2016." *Id.*

## II.    THE PENDING MOTIONS

### A. Defendant's Motions in Limine to Exclude Expert Testimony

#### 1. Legal Standard

"A motion in limine is a request for guidance by the court regarding an evidentiary question." *Hunt Valley Baptist Church, Inc. v. Baltimore Cnty.*, No. 17-CV-804, 2018 WL 2717834, at *7 (D. Md. June 6, 2018) (quoting *United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983), *aff'd*, 469 U.S. 38 (1984)). Typically, pretrial motions in limine seek to exclude prejudicial evidence before it is offered at trial. *Changzhou Kaidi Elec. Co., Ltd. v. Okin Am., Inc.*, 102 F. Supp. 3d 740, 745 (D. Md. 2015) (quoting *Luce*, 469 U.S. at 40 n.2). These motions help to streamline a case by allowing a court to avoid "lengthy argument at, or interruption of, the trial." *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987); *see also Changzhou Kaidi*, 102 F. Supp. 3d at 745 ("[Motions in limine] are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'" (quoting

*Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013))). Motions in limine further promote judicial efficiency by preserving the issues raised for appeal and eliminating the need for parties to renew their objections at trial, "just so long as the movant has clearly identified the ruling sought and the trial court has ruled upon it." *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996); *see* Fed. R. Evid. 103(a); *cf.* R. 103(a) advisory committee's note to 2000 amendment (acknowledging that Rule 103(a) "applies to all rulings on evidence . . . including so-called 'in limine' rulings").

Generally, courts should grant a motion in limine "only when the evidence is clearly inadmissible on all potential grounds." *Dorman v. Anne Arundel Med. Ctr.*, No. 15-CV-1102, 2018 WL 2431859, at *1 (D. Md. May 30, 2018) (quoting *Emami v. Bolden*, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017)). Ultimately, rulings on these motions fall within the trial court's "broad discretion." *Kauffman v. Park Place Hospitality Grp.*, 468 F. App'x 220, 222 (4th Cir. 2012); *see also United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (noting that evidentiary rulings fall within a trial court's discretion).

Here, Defendant seeks to exclude certain testimony by two of Plaintiffs' proposed expert witnesses: Brett Dieck and William Welch. Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. A qualified expert may give testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In essence, the trial court must ensure that the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court provides five non-exhaustive

factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has gained "general acceptance." *Daubert*, 509 U.S. at 592–94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452 (4th Cir. 2010). However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case. *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable, it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and are not supported by the record" is inadmissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 341 (quoting *Daubert*, 509 U.S. at 591).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Anderson v. Home Depot U.S.A., Inc.*, No. 14-CV-2615, 2017 WL

2189508, at *3 (D. Md. May 16, 2017) (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. 08-CV-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n.10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)). On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). The court must determine whether the disputed expert testimony "has a greater potential to mislead than to enlighten." *Id.* If so, the testimony should be excluded. *Id.*; *see also Casey*, 823 F. Supp. 2d at 341 (noting that such testimony would be barred by Federal Rule of Evidence 403).

### 2.  Analysis Relating to Brett Dieck

Brett Dieck, a prospective expert witness retained by Plaintiffs, has opined that Plaintiffs and members of the First Mariner Class were overcharged for title service fees and title insurance. With respect to Plaintiffs' title service fees, Dieck cites two reasons for his opinion: (1) that it is "unusual" that the cost of the Braskos' title exam ($262.12) nearly equates the cost of their abstract ($262.13), and (2) that Rubinstein's title exam fee ($619.60) cannot be justified when compared to the Braskos' title exam fee ($262.12) because "it is extremely likely that the title services . . .

were substantially similar." ECF 86-8 at 5, 7. Dieck opines that a title company's fees should remain consistent across refinance transactions, which are generally simple and consistent, relying on his own "best practice" of charging a flat fee for refinance transactions when he operated a title company. *Id.* at 5; ECF 92-5 at 166:5–170:2.

Dieck, however, proposes no reliable method for determining when a title company's fees are reasonable. He concedes that in 2013, when he worked as a title servicer, he charged a flat fee of $750 for refinance title services, which exceeds the rates paid by both Plaintiffs. *Id.* at 190:6–22. He offered no explanation for how his $750 fee could be reasonable when $619.60 and $262.12 are not, instead asserting "you know it when you see it." *Id.* at 191:1–197:9. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Dieck's "because I say so" approach does not meet the requirements of a reliable methodology and his opinion testimony about title service fees will be excluded.

With respect to title insurance, Dieck opines that the Plaintiffs and members of the First Mariner Class were overcharged. He espouses two theories of overcharge: (1) that Plaintiffs and other class members were "systemically" denied discounted reissue rates, and (2) that they were issued enhanced lender policies. ECF 86-7 at 6–7. With respect to reissue rates, Dieck looked at Stewart Title's rate manual[2] for the state in which the transaction occurred, calculated the applicable reissue rate, and then compared the figure to the price that All Star charged each customer. *Id.* at 3–6. Using that methodology, Dieck calculated that the reissue rate was applied in only 12.7% of the transactions. *Id.* at 6. The Braskos and Rubinstein did not receive reissue rates, as calculated by Dieck. ECF 86-8 at 7–8. Dieck's methodology is flawed, however, because it fails

---

[2] Stewart Title is the title company providing title insurance to All Star's customers.

to establish that Plaintiffs met the criteria for a reissue rate. The rate manual provides that customers are only entitled to a reissue rate if they (1) possessed an owner's policy within the prior seven years and (2) "physically furnished" that policy to the new insurer. ECF 93-6 at 6. Dieck assumes—based on his view that owner's policies are purchased "99.9% of the time"—that "[i]t is likely that" Plaintiffs would have purchased them for their prior mortgage transactions, but he has no evidence to establish that they actually did. ECF 92-5 at 267:11–268:18; ECF 86-8 at 7. Dieck also asserts, without any factual basis, that Stewart Title "would not have enforced" its requirement that the physical policy be furnished to the new insurer. ECF 92-5 at 276:3–279:16.

Finally, Dieck appears to opine that Plaintiffs and other class members were unnecessarily charged for enhanced title insurance policies. ECF 86-7 at 7. He admits, however, that he has not verified whether they unwittingly received an enhanced lender's policy (which could support an overcharge theory) or whether they willingly opted into such policy (which could not). ECF 92-5 at 301:14–304:19. At his deposition, he was unable to state whether Plaintiffs even had obtained enhanced lender's policies, indicating that he would have to refer to his spreadsheet, which does not address the issue. *Id.* at 299:6–301:13; ECF 93-7 at 22–29. Dieck therefore offers no reliable basis for his opinions regarding title insurance overcharge, which will be excluded.

### 3.  Analysis Relating to William Welch

Defendant also seeks to exclude the opinions of another one of Plaintiffs' experts, William Welch. Welch opines that First Mariner failed to institute proper compliance safeguards to prevent RESPA violations.

As a threshold matter, Defendant contends that Welch lacks the requisite knowledge, skill, experience, training, or education to opine on RESPA compliance protocols. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) ("[O]nly experts qualified by 'knowledge,

skill, experience, training, or education' may submit an opinion." (quoting Fed. R. Evid. 702)).
Defendant notes that Welch's experience is in commercial lending, while RESPA pertains to
residential loan transactions.

Welch is an experienced banking auditor and consults in commercial lending policies and
practices. He spent five and a half years with an international accounting firm and held senior
management positions with several financial institutions. ECF 85-28 at 13. Since 1987, he has
worked as an independent consultant to banks, offering credit quality reviews, evaluation of loan
policies, and review of banks' identification and assessment of credit loss in their loan portfolios.
*Id.* He has testified as an expert in dozens of cases in the commercial lending context, including
areas like lender liability, directors' and officers' liability, check forgery, and damages calculation.
*Id.* at 16–22.

While it is beyond dispute that Welch is qualified to provide expert testimony on certain
topics, that expertise does not extend automatically to the entire world of banking. *See Shreve v.
Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) ("[T]he fact that a proposed witness
is an expert in one area does not *ipso facto* qualify him to testify as an expert in all related areas.");
*JFJ Toys, Inc. v. Sears Holdings Corp.,* 237 F. Supp. 3d 311, 323 (D. Md. 2017) (finding that a
proposed expert's general experience in the marketing of toys did not qualify him to specifically
testify about the marketing of an air launcher). Welch has a wealth of experience in commercial
lending, but virtually no experience in the residential mortgage lending policies and practices at
issue in this case. *See* ECF 92-56 at 86:4–94:14 (identifying no resume experience relating to
RESPA compliance). He has neither audited a bank's residential lending practices nor evaluated
the conduct of a residential lending officer in more than 20 years. *Id.* at 190:3–17. He has never
implemented, monitored, or audited a RESPA compliance program. *Id.* at 151:7–21. He has never

attended any lectures, classes, or continuing education on the meaning and import of RESPA. *Id.* at 95:13–21. Finally, Welch has never been engaged or offered as an expert witness in the area of RESPA compliance. *Id.* at 78:6–20. This Court finds, therefore, that Welch lacks the requisite knowledge, skill, experience, training, or education to opine about RESPA compliance safeguards. Defendant's motion to exclude his testimony will be granted.

### B.  Plaintiffs' Motion for Partial Summary Judgment

#### 1.  Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show that a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Casey*, 823 F. Supp. 2d at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

11

Summary judgment shall also be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### 2. Analysis

Plaintiffs seek summary judgment establishing Defendant's successor liability for Plaintiffs' claims against First Mariner. In opposition, Defendant does not contest that it expressly assumed First Mariner's RESPA liability when it merged with First Mariner's successor in interest, Howard Bank. Rather, Defendant merely contends that "[s]uccessor liability is not an independent cause of action," and that any grant of summary judgment on this issue, prior to determining First Mariner's underlying liability, would be "premature." ECF 81-1 at 36.

Defendant's arguments misapprehend Rule 56. As discussed above, Rule 56(a) expressly permits a party to seek summary judgment on any "claim or defense—or the part of each claim or defense . . . ." Fed. R. Civ. P. 56(a); *see also U.S. Equal Emp. Opportunity Comm'n v. CACI Secured Transformations, LLC*, No. 19-CV-2693, 2021 WL 1840807, at *14 (D. Md. May 7, 2021) (noting that Rule 56 "contemplates the possibility that summary judgment may be entered on less

than a full claim and on one or fewer than all of the elements necessary to establish a claim" (citation omitted)). Defendant's successor liability is an essential aspect of the legal claims made by Plaintiffs and the First Mariner Class, as well as a potential defense. Furthermore, Plaintiffs' request for summary judgment is based on the undisputed content of two merger agreements, and therefore presents a purely legal issue. First Mariner has not challenged the relevant terms in the merger agreements or argued that their terms are susceptible to more than one meaning. Accordingly, Plaintiffs' request for summary judgment on the issue of successor liability is proper under Rule 56(a).

This Court agrees with Plaintiffs that, under the terms of the merger agreements, Defendant expressly assumed liability for First Mariner's alleged violations of RESPA. Specifically, First Mariner's merger agreement with Howard Bank, which was entered into on August 14, 2017, included a clause stating that Howard Bank "shall succeed to and assume all the rights and obligations of First Mariner in accordance with" Maryland law. ECF 80-3 at ¶ 1.1. Maryland law provides that, in the event of a consolidation or merger, "[t]he successor is liable for all the debts and obligations of each nonsurviving corporation." Md. Code Ann., Corps. & Ass'ns § 3-114(f)(1); *see also Ramlall v. MobilePro Corp.*, 30 A.3d 1003, 36 (Md. Ct. Spec. App. 2011) ("In Maryland, the General Assembly has imposed the condition that when two corporations merge, the debts and obligations of the predecessor corporation become the debts and obligations of the successor corporation."). Similarly, Howard Bank's merger agreement with Defendant contained a clause stating that Defendant "shall be responsible for all the liabilities of every kind and description, of each of [Defendant] and Howard Bank existing immediately prior to" completion of the merger. ECF 80-6 at ¶ 6. The merger became effective on or about February 5, 2022. ECF 80-7 at 4. Thus, under the plain terms of the merger agreement, Defendant at that time expressly assumed "all the

liabilities" of Howard Bank, including liability for Plaintiffs' and the First Mariner Class's claims, which Howard Bank assumed as part of its merger with First Mariner.

Plaintiffs are thus entitled to summary judgment on the issue of whether Defendant, as First Mariner's successor in interest, can be held liable for Plaintiffs' and the First Mariner Class's claims, should they ultimately be proven.

### C. Defendant's Cross-Motion for Summary Judgment

Defendant has moved for summary judgment on eight different issues. The summary judgment legal standards have already been outlined above. For the reasons stated below, this Court grants the motion in part, denies it in part, and defers it in part.

#### 1. Standing of Named Plaintiffs

Defendant first seeks summary judgment on named Plaintiffs' claims because they lack standing. Standing is a doctrine rooted in the traditional understanding of an Article III "case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)). The burden is on the Plaintiffs to establish these elements. *Id.* (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560).

Since *Spokeo*, it is clear that plaintiffs may not satisfy the strictures of Article III by alleging "a bare procedural violation." 578 U.S. at 341. Rather, plaintiffs must have suffered a concrete harm as a result of the "defendant's statutory violation that is the type of harm Congress sought to

prevent when it enacted the statute." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 253 (4th Cir. 2020) (quoting *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240–41 (4th Cir. 2019)). The Fourth Circuit has explained that under RESPA, "the deprivation of impartial and fair competition between settlement services providers" is not the kind of harm Congress sought to prevent and, thus, will not confer Article III standing. *Id.* at 254. Rather, "the harm it sought to prevent is the increased costs . . . for settlement services." *See id.* (holding that deprivation of fair competition—"untethered from any evidence that the deprivation increased settlement costs—is not a concrete injury under RESPA"); *see also Edmondson v. Eagle Nat'l Bank*, 344 F.R.D. 72, 77 (D. Md. 2023).

Thus, to survive Defendant's motion for summary judgment, Plaintiffs must point to competent evidence creating a genuine issue of material fact about whether they personally were overcharged for their respective title services as a result of the kickbacks paid. Plaintiffs raise a plethora of arguments about different "categories" of overcharge evidence, many of which are unpersuasive either on their face or because there is no evidence that the Plaintiffs falls into the relevant category. This Court is persuaded, however, that Plaintiffs have adduced certain evidence that creates a genuine issue of material fact about whether they were overcharged for title services.

This Court will first address Plaintiffs' unpersuasive evidence of standing, consisting of nine categories. First, in an email sent on September 15, 2010, All Star's account manager, Rob Selznick, tells unidentified "[f]ellas" that title fees would "be at the agreed upon price of $1000 including title insurance" for loan officers who choose not to use All Star's marketing plan, whereas title fees would be "determined on an individual basis" for officers who choose to use the plan. ECF 92-1. This email is irrelevant because it was not sent or copied to anyone at First

Mariner, it does not mention First Mariner, and it predates the agreement between All Star and any First Mariner employee by at least one year.

Second, the 2013 Wells Fargo Chart ("the 2013 Chart") consists of a table reflecting the 80th percentile cost for "Title Exam, Search, [and] Abstract Fees" in each state. ECF 93-3. The figures in the 2013 Chart are based on data from loans closed and funded by Wells Fargo's retail lending unit. ECF 93-1 at 80:13–82:7. An earlier version of the Chart ("the 2010 Chart") was distributed to Wells Fargo's retail loan processing employees in March 2010 for use as a reference when analyzing title costs for certain types of loans. *Id.* at 137:16–140:7. According to the 2010 Chart, the mean cost of title services in Maryland was $322.18, the median cost was $260, and the 80th percentile cost was $497. ECF 92-10 at 2. In the 2013 Chart, Wells Fargo updated only the 80th percentile number. ECF 93-3 at 4. For Maryland loans, the 80th percentile number in the 2013 Chart was $755.80, reflecting that 80 percent of loans closed in Maryland by Wells Fargo had title fees below that amount. *Id.* The $524.24 that the Braskos paid and the $619.60 that Rubinstein paid for title services in connection with their refinance loans fall well below the 80th percentile value. Accordingly, the 2013 Chart does not create a material dispute as to whether Plaintiffs were overcharged.[3]

Third, the Wells Fargo "Newsflash" is an internal communication that was sent to certain Wells Fargo employees on January 12, 2010. ECF 92-8. Under a section titled "VA Allowable Fees," the document instructs that "[t]ypically title exam/search or abstract for a refinance transaction will not exceed $250," and that "the closer is required to validate the settlement fee in

---

[3] This Court has determined, in another case, that borrowers whose costs exceed the 80% threshold on the 2010 Chart create a sufficient issue regarding their overcharge to survive summary judgment. *See Bezek v. First Nat'l Bank of Pennsylvania*, No. 17-CV-2902, 2023 WL 348967, at *8–10 (D. Md. Jan. 20, 2023). The 2010 Chart does not apply here because Plaintiffs' loans closed in 2013.

cases where it exceeds $250." *Id.* (emphasis in original). Assuming that the Newsflash, which only applies to wholesale Veteran Affairs ("VA") loans, is applicable to Plaintiffs' loans, it is still inadmissible because Wells Fargo's corporate designee was unable to provide any basis undergirding the $250 figure. The designee testified at his deposition that he was not aware of what, if any, data the Newsflash relied upon. ECF 93-1 at 231:15–18. To the contrary, he stated that he believed the $250 figure was likely not the product of any analysis, but rather "a generalization to state when someone should ask more questions." *Id*. at 232:2–6. Furthermore, the reliability of the $250 benchmark is belied by the fact that the cost of title services varies significantly from state to state. Indeed, the 80th percentile values on the 2013 Chart range from $25 (four states) to $755.80 (Maryland). ECF 93-3. It is simply untenable that the one-size-fits-all, $250 figure is sufficiently probative of whether Plaintiffs (or anyone else) were overcharged.

Fourth, Plaintiffs argue that "individual title service overcharges" can be shown because federal regulations governing VA loans prescribe the charges that a veteran may be charged on a VA loan. They point to a VA pamphlet that expands upon 38 C.F.R. § 36.4313, stating that whenever a permissible title service is performed by a third party such as All Star, "the amount paid by the [veteran] must be limited to the actual charge of that third party." ECF 92-12 at 15. But the only piece of evidence that Plaintiffs rely on is a list of unspecified invoices that are not linked to particular title services. *See* ECF 92-20 at 6. Therefore, Plaintiffs fail to explain or show that they were charged more than All Star's "actual charge."

Fifth, Plaintiffs cite a chart listing "all inclusive" states, ECF 92-13, and contend that persons in such states cannot be charged separately for a title service built into an "all inclusive" insurance premium. But Plaintiffs have not cited any factual or legal authority for this proposition, let alone any evidence that they were subject to duplicative charges for title service fees.

17

Sixth, Plaintiffs claim that they were overcharged for title insurance because they were denied discounted reissue rates. But they have failed to adduce sufficient evidence that they were entitled to those rates in the first place. The applicable rate manual requires Maryland borrowers to possess an owner's policy from the prior seven years and to physically furnish that policy to the insurer. ECF 93-6 at 6. Plaintiffs offer no evidence that they did so, other than Dieck's speculative expert testimony, which this Court has excluded.

Seventh, Plaintiffs cursorily suggest that they were overcharged for title insurance because they were charged "unnecessary enhanced or expanded lender's policies." ECF 89 at 14. But no specific evidence is cited to establish that either Plaintiff falls into that category. *See* ECF 92-14 (emails generally pertaining to such policies, but not to Plaintiffs' loans).

Eighth, Plaintiffs cite their alleged "intangible harm" from being deprived of a contractual right to an impartial choice of a title agent. The Fourth Circuit has rejected this as an overcharge theory. *See Baehr*, 953 F.3d at 254 ("[T]he deprivation of impartial and fair competition between settlement services providers—untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury under RESPA.").

Ninth, Plaintiffs point to mail solicitations from First Mariner promising that borrowers would save 30 to 40% on their title fees if they choose All Star. ECF 92-17. Plaintiffs argue that "[a]ny class member denied the promised discount . . . was overcharged." ECF 89 at 15. But this argument assumes its conclusion, and Plaintiffs offer no evidence supporting a finding that they were actually denied the discount. The one email that they cite pertains to mortgage insurance premiums, not title service fees. ECF 92-25 at 3. In any event, given the extraordinary variation in title fee charges in this case, there would not appear to be any practicable way to determine whether any individual borrower did or did not receive a discount, nor is it clear from the mail solicitations

whether the 30 to 40% reflected a discount from First Mariner's "typical" fee or simply indicated that other title servicers generally charge more than All Star does.

Notwithstanding these nine unpersuasive pieces of evidence, this Court is persuaded that two other pieces of evidence create a genuine issue of material fact with respect to named Plaintiffs' standing to sue. First, there is an email from All Star's account manager, Rob Selznick, instructing an All Star employee to raise the title fee for a Maryland transaction from $1,100 to $1,400 "to compensate for marketing." ECF 92-3 at 2. The transaction in question was referred by Bowen to All Star. *Id.* at 5. Because Bowen also referred Plaintiffs' Maryland loans, this email creates a genuine issue of material fact about whether a similar increase was applied to Plaintiffs' fees "to compensate for marketing."

Second, in another email, Selznick states that All Star "charge[s] $500 plus title insurance on Maryland purchases." ECF 92-4 at 20. That email is combined with a series of other emails quoting a price of $500 plus title insurance for Maryland loans that are not connected to joint marketing with First Mariner. *See id.* at 10–19. These emails make it more probable that, absent the joint marketing with Bowen, All Star would have charged Plaintiffs $500 plus title insurance for their Maryland loans. The emails therefore create a genuine issue of material fact regarding Plaintiffs' overcharges, sufficient to establish their standing to sue at the summary judgment stage.

### 2.  Certain Class Members' Standing

Defendant also moves for summary judgment on class members whose title service fees do not exceed the 80% threshold on the 2013 Chart, and class members whose loans closed in states for which the 2013 Chart does not specify an 80% threshold. This Court defers judgment on these class members' standing, pending further discussion at the upcoming hearing.

### 3. Certain Class Members' Claims

Defendant seeks summary judgment as to 44 class members whose loans were originated by loan officers who were not involved in a "fee agreement" with All Star.[4]

For five of these class members, Plaintiffs have offered evidence that the members' loans were, in fact, originated by loan officers involved in a fee arrangement with All Star. *See* ECF 93-12 (showing that Paul Kester, Willie Lovejoy, Todd Osborne, Marquiz Crawley, and Rubinstein had their loans originated by either Bowen, Robert Hoover, or Chris Perrin); ECF 92-2 at 9, 14 (All Star's "Title Fee Structure" sheet assigning fees to Bowen, Hoover, and Perrin). Therefore, this Court denies summary judgment as to these five class members' claims.

For 30 of the class members, Plaintiffs have also offered sufficient evidence to survive Defendant's summary judgment. These 30 class members had their loans originated by loan officers who worked in the Bel Air branch, where Bowen was a sales manager. *See* ECF 89 at 24 n.13 (naming the class members and loan officers). In an August, 2012, email, Bowen assured Selznick that he "ha[d five] people on board" for the marketing stuff, and further stated that All Star "would get a minimum of 35 files, most likely 45–50 in the beginning, and probably up to 60 or so once they are up and running, since [Bowen] will still be originating." ECF 92-35 at 4. This email clearly indicates that there were other loan officers in the Bel Air branch participating in the referrals, establishing that the 30 loans from that branch are properly included in this litigation.

For the remaining nine class members, however, Plaintiffs have not offered similar evidence that the members' claims were implicated in the referral scheme. These nine class members had their loans originated by loan officers who worked in the White Marsh branch, which

---

[4] Defendant's briefing counts 46 class members, ECF 81-1 at 34, but this Court counts only 44 in the spreadsheet that Defendant cites, ECF 86-5.

was managed by Angela Pobletts. Like Bowen, Pobletts had a fee arrangement with All Star. ECF 92-2 at 9, 14. But Plaintiffs cite no evidence suggesting that Pobletts's branch colleagues were also involved in the scheme. As this Court found in a related case, the mere fact that a loan officer worked at the same branch as an officer allegedly involved in the scheme is insufficient, without more, to create a genuine dispute of material fact about this participation in the referral agreement. *Bezek v. First Nat'l Bank of Pennsylvania*, No. 17-CV-2902, 2023 WL 348967, at *14 (D. Md. Jan. 20, 2023). Thus, the borrowers on the nine White Marsh loans initiated by officers other than Pobletts have not adduced evidence of any injury at the summary judgment stage.

### 4. Loans Closed After April 2013

Defendant seeks summary judgment with respect to class members whose loans closed after the last kickback payment occurred in April 2013. Defendant argues that these loans cannot be attributed to any kickback because "any alleged unlawful referral arrangement…ended when All Star's . . . payments ended." ECF 101 at 20. This argument assumes a traditional kickback: the referral of a loan, followed by the payment of money. But Plaintiffs respond that the kickbacks in this case actually operated as kick-"forwards": the payment followed by the referral. Plaintiffs argue that the payments before April 2013 are connected to referrals after April 2013, therefore, the class members whose loans were referred after April 2013 have viable RESPA claims.

Though the traditional kickback arrangement places the referral first and the kickback second, nothing in the applicable statute or regulations confines unlawful kickback arrangements to this order. *See* 12 U.S.C. § 2607; 12 C.F.R. § 1024.14. Rather, an unlawful arrangement can be evidenced when the payment "is received repeatedly and is connected *in any way* with the [referral]." 12 C.F.R. § 1024.14(e) (emphasis added). Here, Plaintiffs have offered some evidence of an unlawful kick-"forward" arrangement. In a series of emails, All Star employees repeatedly

ask Bowen to refer more loans so that it can make a profit from prior marketing contributions. *See* ECF 92-35 at 7 ("I have faith that [Bowen] will make good on this. We have just shy of 20 loans still in the pipe to close which should really help the numbers."); *id.* at 9 ("[W]e are probably around break even over the last 90 days…[W]e were expecting to be around 35+ closings per month. How is February shaping up for you?"). These emails create a genuine dispute of fact that the alleged scheme affected class members whose loans were referred after April 2013.[5]

### 5. RESPA Violation

Defendant argues that the arrangement between All Star and First Mariner falls within the "safe harbor" provision of the RESPA statute, which provides an exception for the "payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c)(2). In other words, RESPA permits "[n]ormal promotional and educational activities that are not conditioned on the referral of business and that do not involve the defraying of expenses that otherwise would be incurred by persons in a position to refer settlement services or business incident thereto." 12 C.F.R. § 1024.14 (g)(1)(vi). The Consumer Financial Protection Board ("CFPB") specifically recognizes that certain marketing services agreements are permissible under RESPA. *See* CFPB, *Real Estate Settlement Procedures Act FAQs*, https://www.consumerfinance.gov/compliance/compliance-resources/mortgage-resources/real-estate-settlement-procedures-act/real-estate-settlement-procedures-act-faqs/#respa-section-8-marketing-services-agreements-msas.

---

[5] Unquestionably, there is a fine line between the alleged "kick-forward" arrangement and a lawful marketing arrangement in which one party is dissatisfied with the results, causing the other party to try to remedy the perceived deficiency to pacify its unhappy business partner. A factfinder must determine which side of the fine line applies here.

The parties dispute whether the arrangement between All Star and First Mariner was a permissible promotional arrangement or an illegal kickback scheme. Both parties cite evidence in support of their preferred view. For example, Defendant cites an advice of counsel letter that All Star received from its attorney and sent to Bowen advising that a payment may not be contingent on successful referrals. ECF 85-10 at 7–8. But the fact that First Mariner knew it should have avoided a RESPA violation does not mean it, in fact, avoided a RESPA violation. For their side, Plaintiffs cite an August, 2012, email from Bowen promising Selznick "a minimum of 35 files" as a part of the marketing arrangement. ECF 92-35 at 4. In another email from March, 2013, Selznick tells Bowen that he saw "the most recent invoice . . . for marketing," and wanted to "check in" and see whether "more loans [were] coming through." *Id.* at 41. While a close question, these emails suffice to create a genuine issue of material fact regarding an illegal, quid pro quo exchange of referrals and payments. This issue, then, presents a quintessential factual dispute and does not provide a basis for summary judgment.

### 6. RICO Violation

Defendant also contends that Plaintiffs have not provided evidence of any fraudulent mailings in connection with the alleged scheme and have not established that Rubinstein's loan resulted from a mail solicitation. Neither is required. Plaintiffs have adduced evidence that creates a genuine issue of material fact about whether the arrangement constituted a scheme to defraud or a legitimate marketing arrangement. If a scheme to defraud, Plaintiffs have established that mailings were used in connection with the scheme. *See* ECF 92-17 (exemplar marketing mailings). The Supreme Court specifically rejected the notion that each plaintiff needs to demonstrate reliance on fraudulent mailings. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647–49 (2008). Here, although the mailings were neither fraudulent nor relied on, they were used "in

furtherance of" what Plaintiffs contend is a scheme to defraud borrowers by overcharging title fees. *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996). Such circumstance is sufficient to create a genuine dispute of fact regarding a RICO violation.

### 7.  Vicarious Liability

To prove their RESPA claims pursuant to 12 U.S.C. § 2607(a), Plaintiffs must show "(1) a payment of a thing of value, (2) given and received pursuant to an agreement to refer settlement business, and (3) an actual referral." *Fangman v. Genuine Title, LLC,* No. 14-CV-81, 2016 WL 6600509, at *12 (D. Md. Nov. 8, 2016) (citing *Galiano v. Fid. Nat'l Title Ins. Co.,* 684 F.3d 309, 314 (2d Cir. 2012)). Defendant argues that Plaintiffs cannot show that First Mariner—as opposed to Bowen or another loan broker, acting on their own and without their superiors' knowledge— accepted any kickback or was party to any referral agreement with All Star in connection with Plaintiffs' loans. Plaintiffs respond that even if First Mariner did not sanction the kickbacks, it is nonetheless vicariously liable for the actions of Bowen and the other loan officers.

The Supreme Court has looked to general common law of agency to determine whether an employer may be vicariously liable for its employees' violations of federal law. *See Meyer v. Holley*, 537 U.S. 280, 285–86 (2003). "To determine these common law principles, courts have traditionally looked to the Restatement of Agency." *Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 252 (4th Cir. 2018); *see also Christiana Trust v. Riddle*, 911 F.3d 799, 803 (5th Cir. 2018) (applying Restatement (Third) of Agency to a RESPA vicarious liability claim). Under the Third Restatement, "[a]n employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment." RESTATEMENT (THIRD) OF AGENCY § 7.07(1) (2006). An employee acts within the scope of employment when "performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." *Id.* at §7.07(2).

The scope of employment has "been defined to include all those acts falling within the employee's or agent's general line of work, when they are motivated—at least in part—by an intent to benefit the corporate employer." *Bowen v. Adidas Am., Inc.*, No. 18-CV-3118, 2020 WL 13076108, at *9 (D.S.C. Feb. 27, 2020) (quoting *United States v. Singh*, 518 F.3d 236, 249 (4th Cir. 2008)); *see also United States v. Automated Med. Lab'ys, Inc.*, 770 F.2d 399, 407 (4th Cir. 1985) (stating that scope of employment "has been broadly defined to include acts on the corporation's behalf in performance of the agent's general line of work"). Conversely, "an act of a servant is not within the scope of employment if it is 'within an independent course of conduct not intended by the employee to serve any purpose of the employer.'" *United States v. Hilton*, 701 F.3d 959, 970 (4th Cir. 2012) (quoting RESTATEMENT, *supra*, § 7.07(2)).

Defendant argues that the kickbacks Bowen and the other loan officers purportedly received from All Star were part of an independent course of conduct that was "harmful (not beneficial) to [First] Mariner's interests." ECF 81-1 at 31. Specifically, the former president of First Mariner's Mortgage Division testified that if the company had learned a loan officer was engaged in a RESPA violation, it would "have fired him on the spot and probably reported him to the authorities." ECF 85-13 at 116:9–11, 157:15–158:2.

Defendant's arguments are insufficient to establish, as a matter of law, that the kickback-referral arrangement was outside the scope of the loan officers' employment. *See Richardson v. All. Residential Co.*, No. 18-CV-1114, 2020 WL 2061512, at *8 (D. Md. Apr. 29, 2020) ("[T]he existence of an agent-principal relationship and the scope of an agent's authority are factual questions and so are ordinarily within the purview of the factfinder."). As an initial matter, an employee's actions may be within the scope of employment "even if . . . such acts were against corporate policy or express instructions." *United States v. Basic Constr. Co.*, 711 F.2d 570, 573

(4th Cir. 1983); *see also Richardson*, 2020 WL 2061512, at *8 ("Notably, the Restatement teaches that 'conduct is not outside the scope of employment merely because an employee disregards the employer's instructions.'" (quoting RESTATEMENT, *supra*, § 7.07 cmt. c.)). Therefore, the fact that First Mariner required its loan officers to comply with RESPA is not determinative of whether their conduct was outside the scope of their employment. Rather, the appropriate inquiry is whether their conduct (1) fell within their general line of work and (2) was undertaken at least in part for First Mariner's benefit. *See Singh*, 518 F.3d at 249; *Bowen*, 2020 WL 13076108, at *9; RESTATEMENT, *supra*, § 7.07(2).

To the first point, Plaintiffs offer evidence indicating that the referrals occurred within, or were incidental to, the loan officers' general line of work with First Mariner. It is undisputed that Bowen worked as a loan officer for First Mariner, ECF 92-36 at 10:4–6, and his job was to "originate loans," ECF 93-18 at 59:4–5. According to First Mariner's employee incentive plans, the job duties of officers like Bowen include "coordinating with" various third parties "to ensure that each of the [o]riginators' loans is . . . closed in a timely manner." ECF 93-14 at 4. Such third parties include title service providers like All Star. Thus, a reasonable factfinder could conclude that Bowen was performing work assigned to him as a loan officer—namely, originating and closing mortgage loans—when he referred Plaintiffs' loans to All Star in exchange for a kickback.

Moreover, the record evidence is sufficient to allow a reasonable factfinder to conclude that the referrals were made, at least in part, for First Mariner's benefit. Plaintiffs have adduced evidence that First Mariner received a tangible benefit from the referrals, that is, contributions towards marketing materials intended to grow First Mariner's business. *See* ECF 85-9 (summary of invoices). Bowen also acknowledged that First Mariner generated income from each loan that he closed when it was sold on the secondary market. ECF 92-36 at 33:1–13. The relevant question

26

is whether the referral was "intended by the employee to serve any purpose of the employer." RESTATEMENT, *supra*, § 7.07(2). Because a reasonable factfinder could conclude that the answer to that question is "yes," this Court cannot say, as a matter of law, that the actions of Bowen and the other loan officers were outside the scope of their employment. *See Quick v. Peoples Bank of Cullman Cty.*, 993 F.2d 793, 797 (11th Cir. 1993) (holding bank vicariously liable for loan officers' issuance of fraudulent loans, where the loan officer "had been assigned the function of making loans, and his activities did further that aspect of the [b]ank's business"); *Adams v. Hyannis Harborview, Inc.*, 838 F. Supp. 676, 691 (D. Mass. 1993) (bank director acted within the scope of employment when he sold unregistered securities to plaintiff because his job duties included bringing in business to the bank). Defendant is not entitled to summary judgment on this theory.

Defendant further alleges, however, that there is a heightened standard to impose vicarious liability on an employer for RICO claims. *See In re Am. Honda Motor Co., Inc. Dealerships Rels. Litig.*, 958 F. Supp. 1045, 1051 n.3 (D. Md. 1997) (noting that the unlawful conduct must be "known to and participated in by a sufficiently high-level employee" within the organization or "sufficiently pervasive within the [organization] . . . ."). Defendant urges this Court to apply this standard. Plaintiffs respond that traditional *respondeat superior* principles apply. *See Walls v. Sierra Pac. Mortg., Co., Inc.*, No. 19-CV-595, 2021 WL 252544, at *4 (D. Md. Jan. 26, 2021) (collecting cases). This Court agrees with Plaintiffs because, although the Fourth Circuit has not directly addressed the issue, it has implicitly adopted their approach. *See United States v. Najjar*, 300 F.3d 466 (4th Cir. 2002) ("[P]rinciples of corporate liability apply in the RICO context."); *United States v. Knox*, No. 02-CR-00009, 2003 WL 22019046, at *3–4 (W.D. Va. Aug. 22, 2003)

(explaining the import of *Najjar*).[6] Under principles of corporate liability, Plaintiffs have created

a genuine dispute of fact that First Mariner was liable for Bowen's acts as a loan officer.

### 8. Method of Calculating Damages

Finally, Defendant seeks summary judgment on the method of calculating damages for a

RESPA violation.[7] The amount of damages to which a successful RESPA plaintiff is entitled is

governed by 12 U.S.C. § 2607(d)(2), which states:

> Any person or persons who violate the prohibitions or limitations of this section
> shall be jointly and severally liable to the person or persons charged for the
> settlement service involved in the violation in an amount equal to three times the
> amount of any charge paid for such settlement service.

Defendant argues that Plaintiffs' RESPA damages are limited to three times the amount

that each borrower was overcharged for title and settlement services as a result of the alleged

kickbacks. Plaintiffs, on the other hand, argue that the plain language of the statute entitles them

to treble the amount of all settlement services charged by All Star Title, regardless of whether a

specific charge was actually increased as a result of the kickback.

As the parties acknowledge, there is a split in authority regarding what amount of damages

should be trebled under § 2607(d)(2). Plaintiffs rely largely on analysis from a previous case in

this Court, *Robinson v. Fountainhead Title Grp. Corp.*, 447 F. Supp. 2d 478 (D. Md. 2006). There,

---

[6] Some cases reject *respondeat superior* liability in RICO actions when the corporation comprises the alleged RICO enterprise. *See, e.g.*, *Toucheque v. Price Bros. Co*, 5 F. Supp. 2d 341, 347 (D. Md. 1998). That is not the case here. As Plaintiffs allege, First Mariner is not itself the enterprise, but rather, a participant in the enterprise along with All Star. ECF 1 ¶ 218.

[7] This Court has addressed this identical issue several times in other related cases. *Bezek v. First Nat'l Bank of Pennsylvania*, No. 17-CV-2902, 2023 WL 348967, at *14–15 (D. Md. Jan. 20, 2023); *Edmondson v. Eagle Nat'l Bank*, No. 16-CV-3938, 2023 WL 5336994, at *17–18 (D. Md. Aug. 18, 2023). Although this Court is acutely aware that Plaintiffs disagree with its analysis and seek to obtain appellate review, and that it is not formally bound by its own prior rulings, at this stage this Court remains persuaded by its position and will simply reiterate its reasoning herein.

the Court held that a RESPA plaintiff had adequately alleged in her complaint that she suffered an overcharge as a result of a kickback and therefore had standing to bring her RESPA claim. Id. at 488. Alternatively, however, the Court concluded that such an overcharge was not necessary to establish standing. *Id.* at 488–89. In reaching this latter conclusion, Robinson endorsed the reasoning of another district court, *Kahrer v. Ameriquest Mortgage Co.*, 418 F. Supp. 2d 748 (W.D. Pa. 2005), which concluded that the seemingly expansive language of RESPA's damages provision—providing for recovery of three times the amount of any charge paid for settlement services, as opposed to merely the amount of an overcharge—strongly indicated that allegations of an overcharge were not necessary to show an injury under the statute, as was required to establish standing. *Id.* Ultimately, *Robinson* agreed with *Kahrer* that the damages provided under RESPA "appear to encompass all of the charges associated with the services provided rather than only treble the amount of any overpayment." *Id.* at 488 (quoting *Kahrer*, 418 F. Supp. 2d at 753).

Importantly, however, *Robinson* preceded *Baehr.* There, the Fourth Circuit, relying on the Supreme Court's decision in *Spokeo*, expressly held that a RESPA plaintiff must allege and prove an overcharge in order to have standing to recover monetary damages. *Baehr*, 953 F.3d at 254–56 ("Congress specified in RESPA that by prohibiting kickbacks, the harm it sought to prevent is the increased costs that 'tend' to result from kickbacks' interference with the market for settlement services."). The Fourth Circuit rejected the plaintiffs' attempted reliance on *Robinson*, reasoning that *Robinson* was "pre-*Spokeo*" and, further, that the plaintiffs in *Robinson* had in fact alleged injuries due to overcharges. *Id.* at 255. Thus, to the extent that *Robinson* held that a RESPA plaintiff need not allege an overcharge to have standing, that holding has been overruled by *Baehr*. *Robinson*'s brief discussion of RESPA's damages provision as part of its now-repudiated standing analysis is of little persuasive value here.

Ultimately, this Court agrees with Defendant that the best reading of § 2607(d)(2) is that a damages award for a RESPA violation consists of three times the amount of the overcharge. "When interpreting a statute, [courts] begin with the plain language." *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013). Here, the statute provides for damages "in an amount equal to three times the amount of any charge paid for *such* settlement service." § 2607(d)(2) (emphasis added). "Such" in this case refers back to "the settlement services involved in the violation." *Id.* Plaintiffs, however, seek to treble the amount paid for all of their settlement services, regardless of whether any of those charges were actually increased by an illegal kickback. This Court joins the numerous others who have rejected Plaintiffs' proposed reading of § 2607(d)(2). *See Durr v. Intercounty Title Ins. Co. of Ill.*, 14 F.3d 1183 (7th Cir. 1994) (rejecting a demand for trebled damages on all settlement services under RESPA); *Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1427 (S.D. Fla. 1997) ("[A] better reading of the statute is that the damage award consist of three times the amount which violates RESPA."); *Moore v. Radian Group, Inc.*, 233 F. Supp. 2d 819, 826 (E.D. Texas 2002); *Mullinax v. Radian Guar., Inc.*, 311 F. Supp. 2d 474, 486 (M.D.N.C. 2004).

Defendant's interpretation of § 2607(d)(2) is also consistent with RESPA's purpose. Specifically, Congress passed RESPA to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices" through "the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601; *see also Baehr*, 953 F.3d at 254; *Edmondson v. Eagle Nat'l Bank*, 922 F.3d 535, 547 (4th Cir. 2019). It is difficult to see how RESPA's goal of preventing increased settlement charges is served by allowing a defendant to collect damages for charges that are not in any way increased by an alleged kickback. Moreover, such an approach is arguably at odds with *Baehr*, which specified that the

injury-in-fact that gives a plaintiff standing to bring a RESPA claim is the increased costs—that is, the overcharge—that result from an illegal kickback. *Baehr*, 953 F.3d at 254–56. Under Plaintiffs' proposed reading, the amount of damages available to a RESPA plaintiff would be determined completely by the total amount paid for title services (with larger loans subject to higher title insurance premiums and, by extension, greater damages), regardless of the amount of any actual overcharge. This Court rejects such an approach, and instead agrees with *Moore* that "[t]ying (and trebling) the recoverable damages to that portion of the charge for the settlement service 'involved in the violation' advances the purposes of RESPA while respecting Article III's command that a private plaintiff must suffer an actual injury before invoking the jurisdiction of a United States District Court." *Moore*, 233 F. Supp. 2d at 825.

In sum, this Court agrees with Defendant that pursuant to § 2607(d)(2), the damages Plaintiffs may seek are treble the amount (if any) that they were overcharged by All Star as a result of the alleged illegal kickbacks. Defendant is therefore entitled to summary judgment on this issue.

## III.    CONCLUSION

For the foregoing reasons, Defendant's two motions to exclude experts, ECF 83, 84, are GRANTED; Plaintiffs' motion for partial summary judgment, ECF 80, is GRANTED; and Defendant's cross-motion for summary judgment, ECF 81, is GRANTED IN PART, DENIED IN PART, and DEFERRED IN PART. A separate order follows.

This Court has additional questions about Defendant's motion to decertify the First Mariner Class, ECF 82, and the deferred portion of Defendant's cross-motion for summary judgment, ECF 81. Thus, this Court has scheduled another hearing to discuss those issues prior to ruling on them.


Dated: November 1, 2023                           /s/
                                    _____
                                    Stephanie A. Gallagher
                                    United States District Judge