IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| RICHARD BRASKO, *et al.*, | * |
| Plaintiffs, | * |
| v. | *    Civil No. SAG-20-3489 |
| FIRST NATIONAL BANK OF PENNSYLVANIA, | * |
| Defendant. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Richard Brasko, Lori Brasko, and Eric Rubinstein (collectively "Plaintiffs") represent a class of borrowers who had residential mortgage loans serviced by First Mariner Bank ("First Mariner"). They sued First Mariner's successor entity, First National Bank of Pennsylvania ("Defendant"), seeking damages relating to kickbacks that First Mariner employees allegedly received from a title company in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–17, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68. This Court previously issued a memorandum opinion and order resolving Defendant's motions to exclude experts, Plaintiffs' motion for summary judgment, and most of Defendant's cross-motion for summary judgment. ECF 108. What remains are (1) Defendant's motion to decertify the class, ECF 82; and (2) one portion of Defendant's cross-motion for summary judgment, ECF 81. This Court has reviewed the two motions, along with the related exhibits and briefing. ECF 85, 86, 89, 90, 92, 93, 101. This Court also held hearings on August 30, 2023, and November 7, 2023. For the reasons below, Defendant's motion to

decertify the class will be denied, subject to the amended class definition described herein, and the remaining portion of Defendant's cross-motion for summary judgment will be denied.

## I.      FACTUAL BACKGROUND

The background of this case was reviewed in this Court's prior memorandum opinion on November 1, 2023. ECF 108. Plaintiffs allege that they and 250[1] other borrowers were overcharged for title settlement services because First Mariner brokers—including Tom Bowen, the sales manager at the bank's Bel Air branch—referred their loans to All Star Title, Inc. ("All Star") as part of an illegal kickback scheme. ECF 54 ¶¶ 25–35. Relevant to the instant issues, in a memorandum opinion and order issued on March 29, 2022, this Court granted Plaintiffs' motion to certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure. ECF 46, 47. Plaintiffs received certification of the following class of individuals, with two subclasses:

> All individuals in the United States who were borrowers on a mortgage loan obtained from First Mariner Bank for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1 or Closing Disclosure, between January 1, 2012 and January 31, 2016. Exempted from this class is any person who, during the period of January 1, 2012 through January 31, 2016, was an employee, officer, member and/or agent of First Mariner Bank, Howard Bank, or All Star Title, Inc.

ECF 47 at 2. The first subclass, the RICO subclass, is comprised of all members of the class. *Id.* The second subclass, the RESPA subclass, "is comprised of all members of the First Mariner Class who were borrowers on a federally related mortgage loan (as defined under RESPA, 12 U.S.C. § 2602) between January 1, 2012 and January 31, 2016." *Id.* With respect to standing, this Court reasoned that "the fact that Plaintiffs may have been overcharged by different amounts as a result of the kickbacks" did not destroy the predominance of common issues in the case. ECF 46 at 10.

---

[1] Plaintiffs' initial class certification briefing identified 258 putative class members, ECF 31-3, but their most recent exhibit list provided at the motions hearing only lists 250 class members, Pls' Ex. 65, ECF 112.

But this Court also noted that "Plaintiffs will ultimately need to prove that each class member was injured." *Id.*

Now having concluded discovery, Plaintiffs posit not only that class members were overcharged by different amounts, but also that several distinct *methods* can and should be used to determine whether a member was overcharged. These methods correspond to particular pieces of evidence.

First, Plaintiffs propose a series of emails suggesting that All Star charged "$500 plus title insurance" on transactions unaffected by the alleged kickbacks. In one email, All Star's account manager, Rob Selznick, states that All Star "charge[s] $500 plus title insurance on Maryland purchases." ECF 92-4 at 20. Another email similarly declares that "FHA [s]treamline fees are $500 plus title for states [we are] licensed in." ECF 122-4 at 7. Those two emails are corroborated by a series of other emails discussing individual transactions in Maryland, Ohio, Florida, North Carolina, Virginia, and California for which All Star quotes a price of $500 plus title insurance. *See* 92-4 at 1–19, 21–31; ECF 122-1 to 122-5.[2]

Second, Plaintiffs propose that All Star charged $1,400 or less for title service fees and title insurance on transactions unaffected by the alleged kickbacks. They rely on an email from Selznick that instructs an All Star employee to raise the title fee for a single Maryland transaction from $1,100 to $1,400 "to compensate for marketing." ECF 92-3 at 2. The transaction in question was referred by Bowen to All Star. *Id.* at 5.

---

[2] Defendant argues that the emails involving states other than Maryland are (1) not part of the record, (2) not admissible, and (3) not relevant. ECF 123. This Court rejects these arguments. First, the emails were obtained during discovery and both parties have been privy to the emails for at least two years. ECF 124-1. Second, the emails can be rendered admissible via the anticipated testimony of Selznick or Jason Horwitz, All Star's president. Third, the emails collectively suggest a pattern of pricing that All Star applied across its spectrum of bank customers.

Third and finally, Plaintiffs propose the 2013 Wells Fargo Chart ("the 2013 Chart"), which consists of a table reflecting the 80th percentile cost for "Title Exam, Search, [and] Abstract Fees" in each state, such as $755.80 in Maryland. ECF 93-3. The 2013 Chart relies on data from loans closed and funded by Wells Fargo's retail lending unit. ECF 93-1 at 80:13–82:7. Wells Fargo distributed an earlier version of the Chart ("the 2010 Chart") to its retail loan processing employees in March 2010 for them to use when analyzing title costs for certain types of loans. *Id.* at 137:16–140:7; ECF 92-10.

## II.   THE PENDING MOTIONS

### A.  Defendant's Motion to Decertify the Class

#### 1.  Legal Standard

"[A]n order that grants or denies class certification may be altered or amended before final judgment." FED. R. CIV. P. 23(c)(1)(C). "Indeed, 'an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate." *Minter v. Wells Fargo Bank, N.A.*, No. 07-CV-3442, 2013 WL 1795564, *2 (D. Md. Apr. 26, 2013) (quoting *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir.1990)). However, "commentators have cautioned that courts should be wary of motions to decertify which simply reargue certification 'in the absence of materially changed or clarified circumstances.'" *Id.* (quoting 3 NEWBERG ON CLASS ACTIONS § 7:47 (4th ed. 2012) (alteration adopted)). "[D]ecertification is a drastic step, not to be taken lightly." *Alig v. Quicken Loans Inc.*, No. 12-CV-114, 2017 WL 5054287, at *10 (N.D.W. Va. July 11, 2017) (quoting 3 NEWBERG ON CLASS ACTIONS § 7:37 (5th ed. 2013)).

"[A] motion to decertify is reviewed against the same standards as a motion to certify (i.e., the requirements of [Federal Rule of Civil Procedure 23])." *Minter*, 2013 WL 1795564, *2 (citing

4

*Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 544 (E.D. Va. 2000)). Specifically, Rule 23(a) requires that (1) the alleged class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the representatives' claims are typical of the claims of the class, and (4) the representatives will fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a). After satisfying the Rule 23(a) prerequisites, the plaintiffs must show that the proposed class action satisfies one of the enumerated conditions in Rule 23(b). *E.g., Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Here, Plaintiffs sought and were granted class certification pursuant to Rule 23(b)(3). Under that rule, a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### 2.   Standing of Named Plaintiffs

Defendant first argues that the evidence adduced in discovery illustrates that Plaintiffs are inadequate class representatives because they lack standing. For reasons explained in its prior memorandum opinion on November 1, 2023, this Court disagrees. *See* ECF 108 at 14–19. Plaintiffs have offered sufficient evidence to create a genuine dispute that they were overcharged and that they therefore have standing to sue. *See id.*

### 3.   Issues of Adequacy, Typicality, and Superiority

Despite the named Plaintiffs' standing, the class as currently defined has a number of issues rendering its constitution problematic. First, the class as currently defined suffers from an adequacy issue and, more fundamentally, an internal conflict of interest. Plaintiffs' post-hearing letter, dated December 1, 2023, outlines four different methods that they intend to use to support

overcharges (and therefore standing to sue) for the 240 remaining class members[3]: (1) borrowers with loans on homes in Maryland, Florida, Ohio, California, North Carolina, or Virginia who were charged more than $500 plus title insurance; (2) borrowers whose loans exceeded the 80th percentile threshold on the 2013 Chart; (3) borrowers who were charged more than $1,400 on a loan originating in Bowen's branch; and (4) title insurance overcharges. ECF 116. This Court finds the last theory problematic. This Court concluded in *Edmondson* that title insurance claims— whether based on the denial of discounted reissue rates or the issuance of enhanced policies—are not amenable to class treatment. *Edmondson v. Eagle Nat'l Bank*, No. 16-CV-3938, 2023 WL 5336994, at *13 (D. Md. Aug. 18, 2023). It takes the same position here. Title insurance overcharges are inherently individualized in terms of the required proof, and are not amenable to being adjudicated in a class action, either as a basis for standing or as damages.

This Court is then left with three distinct theories of overcharge, posing an internal conflict. The named Plaintiffs' homes are in Maryland and they paid more than $500 plus title insurance, but they did *not* meet the 80th percentile threshold and Rubinstein did not pay more than $1,400 in total. The question becomes, then, whether they are adequate class representatives for those class members who premise their injury on the 80th percentile or $1,400 thresholds. This Court concludes that they are not.

The Supreme Court has addressed a related question of whether named plaintiffs have standing to represent class members whose injuries differ from their own. In *Blum v. Yaretsky,* 457 U.S. 991 (1982), two named Medicaid plaintiffs had been transferred to a lower level of nursing home care by a state committee, whereas other class members had been transferred to facilities providing higher levels of care by that same committee. *Id.* at 999–1001. The Supreme Court

---

[3] In that letter, which refers to a chart summarizing the 250 class members and the bases for their overcharge theories, Plaintiffs concede that 10 of the listed transactions are no longer part of the class. ECF 116 at 2.

concluded that the differences between the two types of transfers were sufficiently different "that any judicial assessment of [the procedural adequacy of the decisions to transfer to higher level facilities] would be wholly gratuitous and advisory," *id.* at 1001, reasoning that the named plaintiffs lacked "the necessary stake in litigating conduct . . . to which [they] ha[d] not been subject," *id.* at 999 (citation omitted).

Here, not only do the named Plaintiffs lack the necessary stake in litigating whether the 2013 Chart or the $1,400 standard is an appropriate means of determining overcharge, but they actually have defined interests in showing that they are not. As this Court has discussed in related cases, a factfinder may or may not ultimately be persuaded that the 80th percentile numbers are meaningful, given that (1) they derive from a different bank, (2) it is unclear how many data points went into generating the figures, and (3) the greatly scattered nature of the charges on First Mariner loans may not prove that every higher figure is inherently an overcharge, despite the Chart's content. *See Bezek v. First Nat'l Bank of Pennsylvania*, No. 17-CV-2902, 2023 WL 348967, at *8 (D. Md. Jan. 20, 2023); *Edmondson*, 2023 WL 5336994, at *10 n.9. Similarly, a factfinder may or may not ultimately be persuaded that the $1,400 number is meaningful, given that it comes from one email pertaining to a single transaction rather than a series of emails suggesting a broadly applicable standard of pricing across multiple transactions. These issues will need to be litigated vigorously if the class members' claims are to succeed. Yet the named Plaintiffs are not incentivized to successfully convince a factfinder that the 2013 Chart is the correct measure of overcharge because they would then lose their individual claims, having paid *less* than the 80th percentile threshold. Similarly, if named Plaintiffs were to convince the jury that $1,400 is the appropriate level over which a person can be deemed overcharged, Rubinstein would lose his

claim. Clearly, named Plaintiffs are not adequate representatives for class members relying on those alternative theories to demonstrate overcharges.

Moreover, the class cannot coexist harmoniously in a single trial with these different theories of overcharge. Some class members may be entitled to recovery under a theory of overcharge based on $500 plus title insurance, but might lose if the 2013 Chart number is adopted. *See* ECF 86-5 (listing at least 25 Maryland class members—including Heefner, Daeschner, and Travitz—whose title fees lie between $500 and $755.80). Similarly, some class members will be entitled to recovery under the $1,400 theory but not under any others. *See id.* (listing at least five class members—including Ramirez-Lopez, Fortune, and Holsapple—whose title fees fall below the $500 and the Wells Fargo threshold, but whose total charges, inclusive of insurance, exceed $1,400). These internal conflicts cannot be resolved if the claims are tried simultaneously to a single factfinder. There simply cannot be common proof on these issues. Accordingly, it is now clear that the class as originally certified does not meet the adequacy and typicality requirements of Rule 23.

Additionally, with the class as presently certified, class action is not a superior means of adjudication. Plaintiffs have simply not offered any practicable method for the current class claims, with their plethora of damage theories requiring some individual presentations of evidence, to be tried in a coherent trial of reasonable length. At some point, the individual issues simply overwhelm the common ones in a practical sense, meaning that any efficiencies that might be realized by the common presentation of evidence would be dwarfed by the complexity of the overcharge and damage landscape.

However, this Court is mindful that "decertification is a drastic step, not to be taken lightly." *Alig v. Quicken Loans Inc.*, No. 12-CV-114, 2017 WL 5054287, at *10 (N.D.W. Va. July

11, 2017) (quoting 3 NEWBERG ON CLASS ACTIONS § 7:37 (5th ed. 2013)). Rule 23(c)(1)(C) expressly provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Thus, "[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 160 (1982); *see also Piotrowski v. Wells Fargo Bank, NA,* No. 11-CV-3758, 2015 WL 4602591, at *5 (D. Md. July 29, 2015) ("The court possesses the power to modify the class definition."). When faced with a decertification motion, this Court has previously amended the class definition rather than outright decertifying a class that no longer meets Rule 23's requirements. *See Edmondson*, 2023 WL 5336994, at *14 (redefining class because of predominance concerns related to title insurance overcharge); *In re Titanium Dioxide Antitrust Litig.,* 962 F. Supp. 2d 840, 863 (D. Md. 2013) (redefining class because of typicality, commonality, and predominance concerns related to differences in contractual relationships).

Rather than decertify the class, then, this Court will amend the class definition to ensure that the predominance and adequacy requirements of Rule 23 remain satisfied. Specifically, this Court remains satisfied that Plaintiffs are adequate representatives of a class of borrowers who rely on the "$500 plus title insurance" theory of injury. Claims from borrowers on loans for homes in certain states, for which there is some evidence of use of that standard of pricing, are thus subject to common proof that predominates over individual inquiries.[4] And there are 126 such claims,

---

[4] The evidence that "$500 plus title insurance" constituted a standard framework is stronger in some states than it is in other states. Some states enjoy direct evidence of a blanket policy. *See* ECF 92-4 at 20 ("We charge $500 plus title insurance on Maryland purchases."); ECF 122-4 at 6 ("All-Star has offered a flat fee of $500 plus Title Insurance for FHA Streamlines."). In other states, there is merely evidence of individual transactions for which All Star charged $500 plus title insurance. *See* ECF 122-2 at 2–5 (setting the price for three individual transactions in Florida; ECF 122-5 (setting the price for three individual transactions in Virginia). This Court is persuaded that although the direct evidence is stronger than the individual transaction evidence, both types of evidence create a jury issue as to whether the $500 threshold constituted a presumptive rate sufficient to establish overcharge where it was exceeded. Finally, Defendant argued at the motions hearing that the $500 threshold was inapplicable because it only applied to purchase

meaning that the class continues to fulfill the numerosity requirement. *See In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) ("Though no specified number is needed to maintain a class action, as a general guide, a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.") (cleaned up) (citations omitted). Thus, this Court will amend the class order as follows (with additions noted in **bold**):

> All individuals in the United States who were borrowers on a mortgage loan **(a)** obtained from First Mariner Bank **for a home in Maryland, Florida, Ohio, North Carolina, Virginia, or California; (b)** for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2012 and January 31, 2016**; and (c) for which the overall charges for title services exceeded $500 plus the cost of title insurance**. Exempted from this class is any person who, during the period of January 1, 2012 through January 31, 2016, was an employee, officer, member and/or agent of First Mariner Bank, Howard Bank, or All Star Title, Inc.

There will be two subclasses. The first subclass, the RICO subclass, is comprised of all members of the class. The second subclass, the RESPA subclass, is comprised of all members of the class who were borrowers on a federally related mortgage loan (as defined under RESPA, 12 U.S.C. § 2602) between January 1, 2012 and January 31, 2016.

This Court also considers whether this type of amendment to the class definition creates an impermissible fail-safe class, defined as "one that requires a finding of liability before ascertaining whether an individual is a class member." *Chado v. Nat'l Auto Inspects., LLC*, No. 17-CV-2945, 2019 WL 1981042, at *4 (D. Md. May 3, 2019). Here, class membership does not depend on a finding of liability. A jury may conclude that a borrower was charged more than $500 plus title insurance, but that those charges reflected legitimate settlement services rather than an illegal kickback arrangement. Or a jury may conclude that kickbacks were paid, but that some or all of

---

transactions, not refinances. But there is at least some evidence that the $500 threshold applied to refinances. *See* ECF 92-4 at 18–19 ("Please provide a 200K refinance settle quote on a house in Baltimore City."); ECF 122-1 at 3–4 (charging $500 plus title insurance on a "Rate term refi" [sic] in California).

the class members were still charged the same amount they would have otherwise paid without suffering any additional overcharge, particularly given the unregulated capitalistic business model employed by these companies. In no sense, then, does meeting the criteria for membership in this class establish that any member has a valid claim. It simply shows that the member's claim can be appropriately adjudicated in a Rule 23 proceeding represented by these similarly situated Plaintiffs.

This Court is aware that this ruling might justifiably impact the decision of one or more class members to proceed with adjudicating their claims against Defendant within the confines of this class action. Specifically, if class members believe that they might recoup higher damages under the Wells Fargo theory of overcharge, or if they believe they have title insurance overcharge damages that are excluded from this class action, they might now wish to opt out of this class and proceed to trial on an individual basis.[5] This Court therefore will order that an opt-out notice be disseminated to the remaining class members to advise them of the fact that they may forfeit their opportunity to raise certain damages claims by remaining in this class action. The order accompanying this opinion will direct the parties to confer to try to agree on the form and substance of an opt-out notice. After receipt of a status update from the parties, this Court will schedule a conference promptly to discuss any issues on which the parties cannot reach agreement.

For the foregoing reasons, this Court will enter an order amending the class certification order as described herein. The order will also direct the parties to confer regarding the form and prompt issuance of an opt-out notice fairly advising remaining members of the amended class that they may be foregoing certain categories of damage claims by choosing to proceed in this class action versus pursuing an individual case.

---

[5] For example, a Florida class member may prefer the Wells Fargo measure because, assuming for illustration purposes that she paid $1,000 for settlement services, she might receive $500 under the "$500 plus title insurance" calculation (subtracting $500), but up to $825 if the Wells Fargo 2013 Chart is used, since the 80th percentage figure in that chart is just $175.

### B. Defendant's Cross-Motion for Summary Judgment

In its prior memorandum opinion on November 1, 2023, this Court deferred judgment on a portion of Defendant's cross-motion for summary judgment. This Court now addresses that portion in light of the amended class definition.

### 1. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show that a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Casey*, 823 F. Supp. 2d at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Summary judgment shall also be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107

F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

### 2.   Certain Class Members' Standing

Defendant seeks summary judgment on 93 class members whose title services fees do not exceed the 80th percentile threshold on the 2013 Chart, and two class members whose loans closed in states for which the 2013 Chart does not specify an 80th percentile threshold. For 37 of these class members, their title services fees exceed $500, and therefore, they have sufficient evidence to create a genuine dispute of their standing under the "$500 plus title insurance" theory. Pls' Ex. 65; ECF 112. This Court denies summary judgment as to those members. The remaining 58 individuals are no longer a part of the class, as amended above, because their title services fees do not exceed $500. Pls' Ex. 65; ECF 112. Because this Court finds it unnecessary to rule on claims that are no longer a part of this case, it denies Defendant's cross-motion for summary judgment as moot regarding those now-former class members. *Cf. TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) ("[F]ederal courts do not issue advisory opinions.").

### III.   CONCLUSION

For the foregoing reasons, Defendant's motion to decertify the class, ECF 82, is DENIED except that the class will be redefined as described herein; and the remaining portion of Defendant's cross-motion for summary judgment, ECF 81, is DENIED. A separate order follows,

which directs the parties to meet and confer regarding an opt-out notice to be issued to the remaining class members.

Dated: January 5, 2024                                    _____/s/_____
                                                          Stephanie A. Gallagher
                                                          United States District Judge